STATE OF CONNECTICUT *v.* JOHN DEAN ORR
(SC 18172)

Rogers, C. J., and Norcott, Palmer, Vertefeuille and Schaller, Js.

Argued September 15, 2008—officially released May 26, 2009

*W. Theodore Koch III*, special public defender, for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Peter McShane*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. The defendant, John Dean Orr, appeals[1] from the judgment of conviction, rendered after a jury trial, of two counts of harassment in the second degree in violation of General Statutes § 53a-183 (a) (3).[2] The defendant claims on appeal that the trial court improperly: (1) concluded that the dangerous client exception to the social worker-client confidentiality rule established in General Statutes § 52-146q (c)

---

[1] The defendant appealed from the judgment of conviction to the Appellate Court, and we transferred the case from the Appellate Court to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 53a-183 (a) provides in relevant part: "A person is guilty of harassment in the second degree when . . . (3) with intent to harass, annoy or alarm another person, he makes a telephone call, whether or not a conversation ensues, in a manner likely to cause annoyance or alarm."

$(2)^3$ extends to in-court testimony, and thus improperly ordered the social worker who had previously treated the defendant to testify; and (2) admitted uncharged misconduct evidence, including the testimony of four witnesses for the state.[4] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Beginning in 2001, the defendant began visiting with Kenneth Edwards, Jr., a captain in the New London police department. Over a two year period, the defendant's visits with Edwards at his office occurred almost weekly. During these visits, conversation between the two ranged from the defendant's concerns about the police department to discussion about both of their families and themselves. The defendant also regularly called Edwards by telephone, and the two exchanged dialogue similar to that of their face-to-face visits.

---

[3] General Statutes § 52-146q (c) provides in relevant part: "Consent of the person shall not be required for the disclosure or transmission of such person's communications and records in the following situations as specifically limited . . .

"(2) Communications and records may be disclosed when a social worker determines that there is a substantial risk of imminent physical injury by the person to himself or others . . . ."

[4] The defendant raises two additional issues in his brief. He first claims that the trial court improperly denied his motion to dismiss the first two counts of the state's substitute information as being time barred by the applicable statute of limitations. He also claims that the prosecution was void ab initio on the ground that the arrest warrant was issued with the wrong name. The defendant fails to cite any authority or to provide adequate analysis in support of these claims, however, and we therefore decline to review them. See *State* v. *T.R.D.*, 286 Conn. 191, 213–14 n.18, 942 A.2d 1000 (2008) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." [Internal quotation marks omitted.]).

In 2003, Edwards terminated his relationship with the defendant after the defendant began exhibiting unhealthy aggressive behavior toward both Edwards and other officers working for the police department. Thereafter, the defendant became increasingly frustrated with Edwards, and started leaving him angry voicemails. In these voicemails, the defendant often would begin with a fairly calm demeanor, but eventually would escalate to the point that he was screaming angrily, yelling obscenities, saying that he wished Edwards was dead, and threatening both Edwards and his family.

On January 11 and 13, 2005, the defendant left two voicemail messages for Edwards on his office telephone in which he used curse words and accused Edwards of, among other things, giving the defendant's name "up to drug dealers," and attempting to charge him with arson.[5] As a result of these two voicemails, Edwards

---

[5] Edwards saved the voicemails, which were played for the jury during the trial. The defendant left Edwards the following voicemail on January 11, 2005: "Hi, Ken Edwards. This is John Orr. Once again I'm telling the story about how you cheated me every day, denied my subpoena, denied me the right—(beeping sound heard)—anything else in the world, and that your brother threatens to kill me and you let him get away with it, and, um—uhh, I think the other day somebody was making a comment about me up at Sam's. You know, it's really a good police department you (beeping sound heard), right? What's the matter, you can't bust the heroin dealers in this town, Mr. Edwards? Well, just remember this: Don't tick me off too much because I will go to—I will go to Providence, I will go to New York City, I will go somewhere that (beeping sound heard) somebody that f_king really doesn't give a damn, okay? Have a good day, Captain Edwards."

The defendant left Edwards the following voicemail on January 13, 2005: "Hi, Captain Edwards. This is John Orr and I was just talking to some people that are telling me how you get people that are drug addicts to rat out on their drug dealers. And I just thought I would mention to them about Sheri and how she bought at 81 Hempstead Street and when I went to you (beeping sound heard), you gave my name up or somebody in your department gave my name up to drug dealers. And then you proceeded to use your father, the little stinkin' fire department—what was he, a deputy faggot or something like that? But anyway, um—and, I'm sorry, deputy chief (beeping sound heard), that's what they call it, right? And then you went after me for attempting ass—arson, asshole—arson, I'm sorry. I stutter, you know, mental

made a complaint to the New London police department. The defendant subsequently was arrested on a warrant.

The state ultimately charged the defendant with four counts of harassment in the second degree in violation of § 53a-183 (a) (1)[6] and (3).[7] Counts one and two concerned the January 11, 2005 telephone call to Edwards, while counts three and four concerned the January 13, 2005 telephone call. Each count was based respectively on different subdivisions of § 53a-183 (a). The defendant moved to dismiss counts one and two on statute of limitations grounds, and the trial court thereafter denied the motion.

At trial, the state sought to introduce evidence of misconduct by the defendant through the testimony of five different witnesses. Doreen Fuller, the principal of an elementary school, Officers Graham Mugovero, Todd Bergeson and William Edwards,[8] all of the New London police department, and Christopher Burke, a licensed clinical social worker for the department of mental health and addiction services, all testified against the

illness and everything. And then you deny me subpoena. Well, you know what, Captain Edwards? You know what? When you burn in hell (beeping sound heard) with your family, you remember you owe me something, okay? You remember that you owe me your oath. And you can tell your father and your brother and the rest of your family that [they] are nothing but lying, cheating idiots that when (beeping sound heard) you burn in hell and when your children burn in hell and when your wife burns in hell, you deserved it. Have a good day."

Keith Crandall, a detective in the New London police department who was the initial investigating officer, testified at trial that the beeping sound heard during the recorded voicemails is an "electronic signature" to let the person who is making the call to the police department know that they are being recorded.

[6] General Statutes § 53a-183 (a) provides in relevant part: "A person is guilty of harassment in the second degree when: (1) By telephone, he addresses another in or uses indecent or obscene language . . . ."

[7] See footnote 2 of this opinion for the text of § 53a-183 (a) (3).

[8] William Edwards is Captain Edwards' brother. We refer herein to Captain Edwards by his last name only and to William Edwards by his full name.

defendant. The defendant filed a motion in limine to preclude the misconduct evidence, but the trial court denied the motion, admitted the testimony and ordered Burke to testify after concluding that his testimony fell within the dangerous client exception to the social worker-client confidentiality rule.

At the conclusion of the trial, the jury acquitted the defendant of two counts of harassment in the second degree under § 53a-183 (a) (1), but found him guilty of two counts of harassment in the second degree in violation of § 53a-183 (a) (3). The trial court thereafter sentenced the defendant to a total effective term of six months incarceration, suspended after sixty days, with one year probation. This appeal followed.

I

The defendant first claims that the trial court improperly concluded that the dangerous client exception to the social worker-client confidentiality rule contained in § 52-146q (c) (2) permits in-court testimony by the social worker, and that Burke's testimony therefore was improperly ordered by the trial court. More specifically, the defendant claims that the trial court improperly ordered Burke to testify because the social worker-client confidence protected his testimony as confidential. The defendant further claims that recognition of the social worker-client confidence is essential to the mental health and well-being of Connecticut citizens, and that a testimonial exception to this confidentiality under § 52-146q (c) (2) would directly undermine this well-being. Additionally, the defendant asserts that admission of Burke's testimony was *not* a harmless impropriety because the testimony was probative in showing that Edwards was not alone in concluding that the defendant was a danger to Edwards and his family.

In response, the state asserts that § 52-146q (c) (2) creates a testimonial exception to the social worker-

client confidentiality statute that allows social workers to testify and divulge otherwise protected confidential information communicated by a client only if the social worker believes that "there is a substantial risk of imminent physical injury by the person to himself or others . . . ." In the alternative, the state claims that even if this court should find that no testimonial exception exists, the admission of Burke's testimony was a harmless impropriety because Edwards' testimony and the audiotapes of the voicemail messages demonstrate "an overwhelming case of harassment." We agree with the defendant that § 52-146q (c) (2) does not permit in-court testimony by the social worker, and that the trial court improperly ordered Burke to testify. We agree with the state, however, that this improper action by the trial court was harmless.

The following additional undisputed facts and procedural history are relevant to our resolution of this claim. The defendant filed a motion in limine to preclude the state from admitting evidence of misconduct by the defendant. Specifically, the defendant sought to preclude Burke, Fuller, Mugovero, Bergeson, and William Edwards from testifying. In his motion, the defendant objected to the admission of testimony by Burke, whom he argued would improperly breach the statutory social worker-client confidence by testifying. The trial court denied the motion in limine and ordered Burke to testify before the jury about the nature of his relationship as well as his prior communications with the defendant, concluding that his testimony fell within the dangerous client exception to the social worker-client confidentiality statute. The trial court then ordered Burke to answer questions not about the precise statements made to him by the defendant, but instead about his perceptions of what the defendant had told him. The trial court also gave a limiting instruction to the jury

after Burke's testimony as to the proper use of the evidence.

At trial, Burke testified that after being telephoned by the police department, he interviewed the defendant in August, 2003, while the defendant was in lockup for a prior, unrelated charge. Without testifying as to the specific content of his interview of the defendant, Burke testified that his impression after the interview was one of "concern"; he "was very concerned about some of the contents of what [the defendant] had said," and believed that the defendant was "very angry" with Edwards and that both Edwards and his family "might be in danger." Burke further testified that pursuant to the statutory exception to the social worker-client confidentiality statute, he "felt [he] had a duty to warn [Edwards]" of this danger. In answering the state's questions on redirect examination, Burke again testified before the jury that his interview of the defendant occurred while the defendant was in "lockup."

The defendant's claim requires us to interpret § 52-146q (c) (2). We first address the appropriate standard of review. "Well settled principles of statutory interpretation govern our review." *Viera* v. *Cohen*, 283 Conn. 412, 420–21, 927 A.2d 843 (2007); see also, e.g., *Edelstein* v. *Dept. of Public Health & Addiction Services*, 240 Conn. 658, 659, 692 A.2d 803 (1997) (interpretation of General Statutes § 52-146o, physician-patient confidentiality statute). "Because statutory interpretation is a question of law, our review is de novo." *Andover Ltd. Partnership I* v. *Board of Tax Review*, 232 Conn. 392, 396, 655 A.2d 759 (1995); see also *State* v. *Arthur H.*, 288 Conn. 582, 590, 953 A.2d 630 (2008) ("[a]s with any question of statutory construction, our review of this threshold question as to the requirements of the statute is plenary").

In construing § 52-146q, we are mindful of General Statutes § 1-2z,[9] which instructs us that "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning . . . § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *State* v. *Jenkins*, 288 Conn. 610, 620, 954 A.2d 806 (2008); see also *State* v. *Arthur H.*, supra, 288 Conn. 590, citing *State* v. *Bletsch*, 281 Conn. 5, 16, 912 A.2d 992 (2007); *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 294–95, 933 A.2d 256 (2007); *Viera* v. *Cohen*, supra, 283 Conn. 421, citing *Nine State Street, LLC* v. *Planning & Zoning Commission*, 270 Conn. 42, 46, 850 A.2d 1032 (2004). "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal

[9] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

quotation marks omitted.) *Tarnowsky* v. *Socci*, 271 Conn. 284, 287 n.3, 856 A.2d 408 (2004).

In accordance with § 1-2z, we begin our analysis with the text of the statute. Section 52-146q (b) provides in relevant part: "All communications and records shall be confidential and, except as provided in subsection (c) of this section, a social worker shall not disclose any such communications and records unless the person or his authorized representative consents to such disclosure. . . ." The subsection creating the relevant exception in the present case, § 52-146q (c), provides in relevant part: "Consent of the person shall not be required for the disclosure or transmission of such person's communications and records in the following situations *as specifically limited* . . . (2) Communications and records may be disclosed when a social worker determines that there is a substantial risk of imminent physical injury by the person to himself or others . . . ." (Emphasis added.)

The text of § 52-146q (c) thus provides us with particular instructions: it requires that the statutory exceptions to the social worker-client confidentiality statute[10] be "specifically limited" to the specified situations. With regard to § 52-146q (c) (2), we note that the text of the exception requires that, for disclosure to be permitted, the social worker must determine that there is a "substantial" risk of "imminent" physical injury by the client to himself or others. This exception is precise and limited. The apparent intent of this exception is to permit

---

[10] We are mindful that under § 1-2z, we must first look to construe the text as it exists, without reference to outside sources. See, e.g., *Genesky* v. *East Lyme*, 275 Conn. 246, 277–78, 881 A.2d 114 (2005) (must first look to text under § 1-2z analysis). Accordingly, we are careful not to describe the social worker-client confidentiality statute as a privilege until we find an ambiguity that permits reference to extratextual sources and thus allows a deeper exploration of any alleged distinction between confidentiality and privilege.

disclosure in order to prevent imminent physical injury. Section 52-146q (c) (2) is silent, however, as to whether this exception extends to permitting the social worker to testify in court proceedings. This silence is notable because, in contrast, two of the other exceptions specifically reference court proceedings. Section 52-146q (c) (3) provides in relevant part that "[c]ommunications and records made in the course of an evaluation ordered by a court may be disclosed *at judicial proceedings* in which the person is a party . . . ."[11] (Emphasis added.) Additionally, subdivision (4) provides that "[c]ommunications and records may be disclosed *in a civil proceeding* in which the person introduces his mental condition as an element of his claim or defense . . . ."[12] (Emphasis added.) General Statutes § 52-146q (c) (4).

We note with particular emphasis that this silence does not constitute ambiguity.[13] This court has recently made clear that "[t]he fact that . . . relevant statutory

[11] General Statutes § 52-146q (c) (3) provides: "Communications and records made in the course of an evaluation ordered by a court may be disclosed at judicial proceedings in which the person is a party provided the court finds that the person has been informed before making the communications that any communications and records may be so disclosed and provided further that communications and records shall be admissible only on issues involving the person's mental condition."

[12] General Statutes § 52-146q (c) (4) provides: "Communications and records may be disclosed in a civil proceeding in which the person introduces his mental condition as an element of his claim or defense or, after the person's death, when his condition is introduced by a party claiming or defending through or as a beneficiary of the person. For any disclosure under this subdivision, the court shall find that it is more important to the interests of justice that the communications and records be disclosed than that the relationship between the person and the social worker be protected."

[13] The concurring opinion focuses on this silence and contends that because "[t]he provision does not specify one way or the other whether disclosable, nonconfidential communications and records are, nevertheless, privileged," the passage is ambiguous and therefore permits the consideration of extratextual sources. We strongly disagree because, as we will explain, statutory silence does not constitute ambiguity. Moreover, § 52-146q (c) (2) does not meet the standard for ambiguity that we have established in our case law.

provisions are silent . . . does not mean that they are ambiguous." *Carmel Hollow Associates Ltd. Partnership* v. *Bethlehem*, 269 Conn. 120, 133, 848 A.2d 451 (2004); see also *Manifold* v. *Ragaglia*, 272 Conn. 410, 419, 862 A.2d 292 (2004) ("[statutory] silence does not . . . necessarily equate to ambiguity"). Significantly, "[t]he test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Viera* v. *Cohen*, supra, 283 Conn. 421; *Tarnowsky* v. *Socci*, supra, 271 Conn. 287 n.3; see also *Genesky* v. *East Lyme*, 275 Conn. 246, 278, 881 A.2d 114 (2005) (*Borden, J.*, concurring) ("if the text of the statute at issue, considering its relationship to other statutes, as applied to the facts of the case, would permit more than one likely or plausible meaning, its meaning cannot be said to be 'plain and unambiguous' "). The silence of § 52-146q (c) (2) regarding whether it permits in-court testimony by a social worker should not be skewed as to indicate ambiguity for the purpose of looking beyond the text as allowed by § 1-2z. Instead, our case law is clear that ambiguity exists only if the statutory language at issue is susceptible to more than one plausible interpretation. The text of § 52-146q (c) (2) is not susceptible to more than one plausible interpretation. Rather, the statutory exception is silent with regard to court testimony and that silence only furthers our need to examine closely the precise language of the statute in order to understand the legislature's intention. See *Carmel Hollow Associates Ltd. Partnership* v. *Bethlehem*, supra, 133 n.18 (finding no need to resort to legislative history in order to construe statute at issue because, despite silence of statute as to contested meaning, careful examination of statutory scheme and language indicate clear and reasonable interpretation).

We are mindful of the significance of the precise language and syntax used by the legislature in § 52-146q

(b) to indicate its understanding and use of the term "confidential" with regard to its characterization of both the social worker-client confidentiality statute and the exceptions to that confidence laid out in § 52-146q (c). As previously set forth herein, § 52-146q (b) provides that "[a]ll communications and records shall be confidential *and, except as provided in subsection (c) of this section, a social worker shall not disclose any such communications and records . . . .*" (Emphasis added.) Importantly, the legislature explicitly provided that all communications and records are *both* confidential *and* not subject to disclosure, except as specifically excepted in subsection (c) of § 52-146q. The legislature, by virtue of its explicit provision *for both confidentiality and* limited disclosure, clearly indicated that it did not consider the word "confidential" to include the possibility of disclosure[14] and that all communications and records are confidential, regardless of their potential for disclosure.

The implications of this strict reading of the text are significant. Because all communications between social workers and their clients are confidential, those communications falling under the dangerous client exception are confidential as well. When a social worker determines, through communication with his or her

---

[14] This is contrary to the assertion by the concurring opinion that the word "confidential" plainly and unambiguously means that the communications "generally may be disclosed under court order, over the objection of the information supplier, when a court deems it necessary to do so under a standard such as in the interests of justice or necessity." (Internal quotation marks omitted.) If the legislature intended to use this meaning of "confidential," it would not have felt the need to provide explicitly for both confidentiality *and* limited disclosure. Instead, the legislature would merely have described the communications as "confidential," without need to include any disclosure clause because of its inclusion within the meaning of confidentiality. The legislature's provision for confidentiality, however, is separate from its provision that prohibits limited disclosure, and so it is clear that, contrary to the concurrence's conclusion, the legislature intended that *all* communications between social workers and their clients be confidential.

client, that there is a substantial risk of imminent physical injury to either the client or another person, he or she is authorized by the statute to divulge this information at that point for the purpose of preventing injury. The communications, however, retain their confidential nature by virtue of the statutory mandate in § 52-146q (b). Confidentiality is not destroyed by disclosure to prevent injury, and testimony in court proceedings by the social worker about the disclosed communications or records is not allowed.

The marked difference in the text of the statutory exceptions, together with the specific language and syntax used by the legislature, as well as the statute's direction to read the exceptions "as specifically limited," leads us to conclude that this exception was *not* intended to permit in-court testimony. If the legislature wanted to make specific allowances for the disclosure of otherwise confidential communications between social workers and their clients in court proceedings, it could have done so, and, in fact, has already done so in two other subdivisions of § 52-146q (c). See, e.g., *Genesky* v. *East Lyme*, supra, 275 Conn. 258 ("if the legislature wants to grant benefits to [constables and police officers] in a single statutory provision, it knows how to do so"); *Carmel Hollow Associates Ltd. Partnership* v. *Bethlehem*, supra, 269 Conn. 135 ("if the legislature had wanted to grant a municipality . . . discretionary authority with respect to the classification of property as forest land it could have done so"); *State* v. *Higgins*, 265 Conn. 35, 46, 826 A.2d 1126 (2003) ("if the legislature had wanted to make knowledge as to location of a school an element of the offense [of possession of narcotics within 1000 feet of a school], it would have done so" [internal quotation marks omitted]); *State* v. *Sostre*, 261 Conn. 111, 135–36, 802 A.2d 754 (2002) ("if the legislature had wanted to turn killings accomplished during robberies, burglaries and larce-

nies into an [aggravating factor to be considered for the imposition of the death penalty for capital felony], it simply would have said so" [internal quotation marks omitted]); *State* v. *Rivera*, 250 Conn. 188, 199, 736 A.2d 790 (1999) ("if the legislature had wanted to prohibit the state from introducing a witness' testimony before an investigatory grand jury in the state's case-in-chief against that witness, it easily could have done so"). "We presume that the legislature is aware of the judicial construction placed upon its enactments." *State* v. *Crowell*, 228 Conn. 393, 401, 636 A.2d 804 (1994), citing *Cappellino* v. *Cheshire*, 226 Conn. 569, 576, 628 A.2d 595 (1993). Moreover, "[t]he intention of the legislature is found not in what it meant to say, but in the meaning of what it did say." *Colli* v. *Real Estate Commission*, 169 Conn. 445, 452, 364 A.2d 167 (1975), citing *Schwab* v. *Zoning Board of Appeals*, 154 Conn. 479, 482, 226 A.2d 506 (1967). Because the legislature expressly could have permitted disclosure in any court proceedings under § 52-146q (c) (2), as it did in subdivisions (3) and (4), but did not do so, we interpret the statute's silence as evidence of the legislature's intent not to apply the dangerous client exception in the context of court proceedings.

Our examination of the relationship of § 52-146q (c) (2) to other statutes establishing confidentiality of certain records and communications requires a similar interpretation. General Statutes § 52-146o, which was enacted in 1990 only two years prior to § 52-146q, protects patients' communications and information from disclosure by physicians, surgeons and health care providers. Section 52-146o (a) specifically provides that "in any civil action or any proceeding preliminary thereto or in any probate, legislative or administrative proceeding, a physician or surgeon . . . shall not disclose" any communications by or information from a patient. Although § 52-146o is not substantively parallel to § 52-

146q because it prohibits rather than establishes opportunities for in-court testimony by physicians, surgeons and health care providers, it further evidences the legislature's awareness that an issue frequently arises as to whether the statutory confidence can or should be enforced in court proceedings. Where the legislature wants to make an exception for court proceedings, court proceedings are *specifically* referenced.[15] Additionally, General Statutes § 52-146c (b), enacted in 1969, which protects communications between psychologists and patients, provides in relevant part: "[I]n civil and criminal actions, in juvenile, probate, commitment and arbitration proceedings, in proceedings preliminary to such actions or proceedings, and in legislative and administrative proceedings, all communications shall be privileged and a psychologist shall not disclose any such communications . . . ." Although enacted more than two decades before § 52-146q, § 52-146c emphasizes the legislature's ability and tendency to reference specifically court proceedings where it intends either to prohibit or to permit in-court testimony.[16]

---

[15] The concurrence finds it significant that while § 52-146q (c) (2) does not expressly allow the disclosure of communications or records in court proceedings, it also does not expressly prohibit that disclosure. Section 52-146q (c) explicitly requires, however, that the exceptions contained within be read as "specifically limited . . . ." Where those exceptions are limited to include disclosure during in-court testimony, such allowances are specifically made. See General Statutes § 52-146q (c) (3) and (4). Where those allowances are not specifically referenced, however, we decline to read them into the text.

[16] We note that many of the confidentiality statutes established in Connecticut contain specific exceptions for dangerous clients or patients, where those persons' confidences may be breached without their consent if the professional sharing those confidences believes, in good faith, that the person poses an imminent threat or danger either to themselves or to others. Most of these statutes notably reference court proceedings where the legislature either creates or prohibits in-court testimony opportunities. See generally, e.g., General Statutes § 52-146c (psychologist-patient confidentiality statute); General Statutes § 52-146f (psychiatrist-patient confidentiality statute); General Statutes § 52-146o (physician-patient confidentiality statute); General Statutes § 52-146p (marital and family therapist-person confidentiality statute); General Statutes § 52-146s (professional counselor-person confi-

Moreover, General Statutes § 52-146f, which establishes the eight exceptions for the psychiatrist-patient privilege created in § 52-146e, epitomizes the legislature's ability to make explicit allowances for testimonial exceptions in the language of the statute itself. Importantly, § 52-146f contains the same instruction that each exception be read "as specifically limited . . . ." In accordance with this instruction, subsections (4)[17] and (5)[18] of § 52-146f create express exceptions to the evidentiary confidentiality for in-court testimony by the psychiatrist. Subsection (2) of § 52-146f,[19] on the other hand, creates the analogous dangerous patient exception for the psychiatrist-patient privilege and contains no such explicit testimonial allowance. Although the concurring opinion may find significance in the place-

dentiality statute). Additionally, even those confidentiality statutes that do not contain exceptions for dangerous persons make specific reference to court proceedings where the legislature intends to permit or prohibit in-court testimony. See generally, e.g., General Statutes § 52-146k (battered women's assault counselor-victim confidentiality statute); General Statutes § 52-146*l* (interpreter-assisted person confidentiality statute); General Statutes § 52-146m (confidence between hearing impaired person and operator of special telecommunications equipment who provides assistance).

[17] General Statutes § 52-146f (4) provides in relevant part: "Communications made to or records made by a psychiatrist in the course of a psychiatric examination ordered by a court or made in connection with the application for the appointment of a conservator by the Probate Court for good cause shown may be disclosed at judicial or administrative proceedings . . . ."

[18] General Statutes § 52-146f (5) provides: "Communications or records may be disclosed in a civil proceeding in which the patient introduces his mental condition as an element of his claim or defense, or, after the patient's death, when his condition is introduced by a party claiming or defending through or as a beneficiary of the patient and the court or judge finds that it is more important to the interests of justice that the communications be disclosed than that the relationship between patient and psychiatrist be protected."

[19] General Statutes § 52-146f (2) provides in relevant part: "Communications or records may be disclosed when the psychiatrist determines that there is substantial risk of imminent physical injury by the patient to himself or others or when a psychiatrist, in the course of diagnosis or treatment of the patient, finds it necessary to disclose the communications or records for the purpose of placing the patient in a mental health facility . . . ."

ment of the dangerous patient exception with other exceptions in § 52-146f that may be understood to permit in-court testimony,[20] we find the exception's placement to be inapposite to our analysis today. Subsection (2) is one of eight exceptions to the psychiatrist-patient confidentiality statute listed in §. 52-146f. Two of those eight exceptions create explicit exceptions for in-court testimony. See General Statutes § 52-146f (4) and (5). Six of the exceptions do not create such exceptions, and have not been interpreted as doing so one way or the other. See General Statutes § 52-146f (1), (2), (3), (6), (7) and (8). Accordingly, § 52-146f is not only structured precisely like § 52-146q (c), but also has been interpreted in a similar manner. It is a prime example of the legislature's ability to make and, indeed, history of making, explicit exceptions for in-court testimony with regard to the greater evidentiary confidentiality statutes. It only serves as further support for our conclusion today that § 52-146q (c) (2) clearly and unambiguously does not extend to permitting in-court testimony by a social worker.

Having concluded that § 52-146q is clear and unambiguous, we are statutorily prohibited by § 1-2z from conducting any extratextual analysis. Even if we were to conclude, however, that § 52-146q is ambiguous and that we are therefore permitted to consider extratextual

---

[20] The concurrence focuses on §§ 52-146e and 52-146f as the model for the legislature's enactment of § 52-146q. It contends that the legislature's 1969 creation of the dangerous patient exception to the psychiatrist-patient confidentiality statute; see Public Acts 1969, No. 819, § 4 (b), now codified at § 52-146f (2); was intended to be an exception to the more general evidentiary privilege as evidenced by its placement with other such exceptions within the statutory scheme, namely, § 52-146f (1), (4) and (5). We disagree. While the language of subsection (4) and (5) of § 52-146f itself creates exceptions to the evidentiary privilege for in-court testimony, subsection (1) merely allows for the disclosure of communications or records for the purpose of diagnosis or treatment and contains *no* provision that either explicitly permits disclosure of this information during in-court testimony or that has been interpreted by this court to permit the same.

sources, we are not persuaded by the state's claim that the majority of state jurisdictions has concluded that the duty to warn third parties about threatening statements made to a psychotherapist gives rise to an exception to the psychotherapist-client evidentiary confidentiality. Indeed, four of the six state cases, as well as the federal Circuit Courts of Appeal cases,[21] cited by the state to support this proposition concern *common-law* exceptions to confidentiality statutes, and are thus irrelevant to our discussion today. See generally *United States* v. *Auster*, 517 F.3d 312 (5th Cir.), cert. denied, 555 U.S. 840, 129 S. Ct. 75, 172 L. Ed. 2d 67 (2008); *United States* v. *Glass*, 133 F.3d 1356 (10th Cir. 1998); *Bright* v. *State*, 740 A.2d 927 (Del. 1999); *People* v. *Bierenbaum*, 301 App. Div. 2d 119, 748 N.Y.S.2d 563 (2002); *State* v. *Miller*, 300 Or. 203, 709 P.2d 225 (1985), cert. denied, 475 U.S. 1141, 106 S. Ct. 1793, 90 L. Ed. 2d 339 (1986); *State* v. *Agacki*, 226 Wis. 2d 349, 595 N.W.2d 31 (1999). Moreover, the California case to which the state cites interprets a section of the California Evidence Code that expressly creates an exception to the privilege. See *San Diego Trolley, Inc.* v. *Superior Court*, 87 Cal. App. 4th 1083, 1091, 105 Cal. Rptr. 2d 476 (2001); id., 1091 n.1 (quoting § 1024 of California Evidence Code, which provides that " '[t]here is no privilege under this article' "). We are not faced with such clear and express statutory language in § 52-146q (c) (2). Finally, in *Guerrier* v. *State*, 811 So. 2d 852, 855–56 (Fla. App.), review denied, 831 So. 2d 672 (Fla. 2002), the Florida Appellate Court interpreted a statutory dangerous patient exception to

---

[21] Both the state and the concurrence emphasize in particular the analysis in *United States* v. *Auster*, 517 F.3d 312 (5th Cir.), cert. denied, 555 *U.S.* 840, 129 S. Ct. 75, 172 L. Ed. 2d 67 (2008). The analysis by the court in *Auster* bears no relation to our analysis today, however, because its reasoning is based on common-law principles governing federal evidentiary privileges. Thus, the court was not interpreting a statutory enactment, as we are in the present case. Common-law principles have no bearing on our statutory analysis in the present case.

the physician-patient privilege broadly and not strictly and narrowly, as must be done in this case by the express terms of § 52-146q (c).

The statutory exceptions in § 52-146q (c) should be strictly construed and limited to their plain and literal meaning. When compared to other subdivisions of the same statute as well as other similar confidentiality statutes, it is clear that the legislature carefully chose the very precise words that it used in § 52-146q (c) (2) and failed to authorize testimony in court proceedings. Where a social worker "determines that there is a substantial risk of imminent physical injury by the person to himself or others," he or she may choose to disclose that information to prevent physical injury. General Statutes § 52-146q (c) (2). That exception, however, as "specifically limited" by the precise language of the statute, does not permit the social worker to testify as to the client's confidential communication in any court proceedings. Accordingly, we further conclude that the trial court improperly ordered Burke to testify about the communications made to him by the defendant in violation of § 52-146q (c) (2).[22]

---

[22] We briefly address the hypothetical situation proposed by the concurrence, which concerns a third party's failure to apply successfully for a restraining order because of a social worker's inability to testify at the court hearing for such an order. First, we emphasize that "[t]he process of statutory interpretation involves the determination of the meaning of the statutory language as applied *to the facts of the case* . . . ." (Emphasis added; internal quotation marks omitted.) *Weems* v. *Citigroup, Inc.*, 289 Conn. 769, 778, 961 A.2d 349 (2008). Section 1-2z, which specifically directs our attention to the actual text of the statute and its relationship to other statutes, does not permit statutory interpretation to be influenced by hypotheticals. Moreover, although § 52-146q (c) (2) prohibits social workers from testifying as to the substantive content of their confidential communications with and records of their clients, it may not preclude social workers from testifying to: (1) the existence of a confidential relationship; and (2) the fact that the social worker warned the third party of possible injury as permitted under the statute. Some courts have noted a possible distinction between testimony concerning the substance of confidential communications and testimony concerning the fact of disclosure of those communications. See, e.g., *United States* v. *Chase*, 340 F.3d 978, 988 n.4 (9th Cir. 2003), cert. denied, 540 U.S.

We next turn to whether the improper admission of Burke's testimony was harmful. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the [impropriety] was harmful." *State* v. *Young*, 258 Conn. 79, 94–95, 779 A.2d 112 (2001). "[A] nonconstitutional [impropriety] is harmless when an appellate court has a fair assurance that the [impropriety] did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006); see also *State* v. *Snelgrove*, 288 Conn. 742, 758, 954 A.2d 165 (2008).

"[W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Sawyer*, supra, 279 Conn. 358; see also *State* v. *Gonzalez*, 272 Conn. 515, 527, 864 A.2d 847 (2005); *State* v. *Peeler*, 271 Conn. 338, 385, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005); *State* v. *Rolon*, 257 Conn. 156, 174, 777 A.2d 604 (2001).

In the present case, Burke's testimony was not of great importance to the state's case against the defendant. First, Burke's testimony did not include a repeti-

1220, 124 S. Ct. 1531, 158 L. Ed. 2d 157 (2004); *Reed* v. *Williams*, United States District Court, Docket No. CIV S-05-0060, U.S. Dist. LEXIS 55598 *4–5 (E.D. Cal. July 25, 2007).

tion of outrageous remarks made by the defendant, but was limited to a description of the defendant's alleged demeanor toward and feelings about Edwards. The state referenced the testimony only once in its closing argument before the jury, briefly describing it in that way, revealing its relative lack of importance. Second, Burke's testimony regarding the telephone call he made to Edwards was cumulative. Edwards himself also testified to receiving a telephone call from Burke which "put [him] in fear for [his] family's safety." Burke provided the jury with essentially the same information about his telephone call to Edwards as Edwards did himself. Moreover, the defendant concedes in his brief that Burke's testimony was "needlessly cumulative" in that it "simply amounted to a particularly colorful example of [the defendant's] unusual behavior." Accordingly, a third consideration is that not only was Burke's testimony cumulative, but it also was clearly corroborated by Edwards' testimony about the same incident.

Fourth, the defendant was given a unique opportunity to prepare his cross-examination of Burke with the knowledge and foresight of what questions the state would ask Burke during its direct examination. During argument over the defendant's objection to the admission of Burke's testimony, the state specifically outlined for both the court and the defendant the exact questions it planned to ask Burke. As the trial court remarked, the defendant "[knew] exactly what the direct questions [would] be" and thus could "cross-examine with any questions . . . with regard to any documentation or whatever else [he felt to be] necessary." Additionally, the defendant was given an opportunity to speak with Burke during the recess before Burke's testimony, in order to clarify certain points that would be important in his cross-examination. The defendant was thus clearly given a broad opportunity to prepare for his cross-examination of Burke.

Finally, even without Burke's testimony, the state had a strong case against the defendant. The state not only presented Edwards' testimony, but also played for the jury the actual voicemail recordings that the defendant had left for Edwards. Both the voicemail recordings and Edwards' testimony strongly supported the charge of harassment in the second degree. For all of these reasons, we conclude that the improper admission of Burke's testimony did not substantially affect the jury's verdict and it therefore was harmless.

## II

The defendant next claims that the trial court improperly admitted the uncharged misconduct testimony of Fuller, and Officers Mugovero, Bergeson and William Edwards. The defendant claims that each witness' testimony should have been barred as irrelevant, more prejudicial than probative, or cumulative, or all three. He further contends that the admission of any and all of this testimony was harmful. In response, the state claims that the testimony of the four witnesses properly was admitted within the trial court's broad discretion. Specifically, the state asserts that the witnesses' testimony was relevant to the defendant's state of mind and not to his character. We agree with the state and conclude that the trial court did not abuse its discretion in admitting the challenged testimony.

The following undisputed additional facts and procedural history are relevant to our resolution of this claim. At trial, the state introduced the uncharged misconduct testimony.[23] Fuller, the elementary school principal, testified that on March 9, 2005, the defendant telephoned

---

[23] The defendant's motion in limine sought to preclude the testimony of these four witnesses as well as that of Burke. As we previously have referenced herein, the trial court denied the motion. It did, however, give limiting instructions to the jury after each witness testified so that the jury would know for what specific purposes it should consider the testimony.

her and inquired if Edwards' children attended her school; she opined that the call was "reminiscent of child abduction cases." Mugovero, an officer in the New London police department, testified that on March 19, 2004, the defendant approached him and stated that he "was going to skin Captain Edwards."

Bergeson, another New London police officer, testified that: (1) while investigating a reported disturbance at the defendant's home on November 15, 2005, he heard the defendant "yelling and screaming" about how "both . . . Edwards and his brother [William] Edwards should both be dead"; and (2) on April 12, 2006, the defendant told Bergeson that his constitutional rights were being violated, that "Edwards has one more coming," and that Bergeson should "[j]ust tell . . . Edwards that [he is] trying to protect his children, maybe [Edwards will] give [him] $20 for it." Finally, William Edwards, Captain Edwards' brother and an officer with the New London police department, testified about three encounters with the defendant prior to his arrest. During these encounters, which occurred in December, 2003, October, 2004 and November, 2004, respectively, the defendant: (1) accused William Edwards of being a thief; (2) stated that "you'll get yours, I know where your daddy is and where your brother is"; and (3) called William Edwards a coward and stated that "time was running out" for the Edwards family.

We first address the applicable standard of review for this evidentiary challenge. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." *State v. Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). "We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State v. Ritrovato*, 280 Conn. 36, 50,

905 A.2d 1079 (2006); see also *State* v. *Ellis*, 270 Conn. 337, 355, 852 A.2d 676 (2004) ("[r]eversal is required only where an abuse of discretion is manifest or where injustice appears to have been done" [internal quotation marks omitted]). "In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." *DiPalma* v. *Wiesen*, 163 Conn. 293, 298–99, 303 A.2d 709 (1972); see also *State* v. *Hauck*, 172 Conn. 140, 144, 374 A.2d 150 (1976).

"The rules governing the admissibility of evidence of a criminal defendant's prior misconduct are well established. Although evidence of prior unconnected crimes is inadmissible to demonstrate the defendant's bad character or to suggest that the defendant has a propensity for criminal behavior . . . such evidence may be admissible for other purposes, such as to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency." (Internal quotation marks omitted.) *State* v. *Ellis*, supra, 270 Conn. 354; see also *State* v. *Morowitz*, 200 Conn. 440, 442, 512 A.2d 175 (1986).

It is well established that the trial court is afforded broad discretion in determining whether to admit each witness' testimony; *State* v. *Ellis*, supra, 270 Conn. 355; and must conduct a balancing act of the testimony's prejudicial versus probative value. Id., 354. Also, "[s]ome degree of prejudice inevitably accompanies the admission of evidence of a defendant's other misconduct." (Internal quotation marks omitted.) Id., 365; see also *State* v. *Sierra*, 213 Conn. 422, 436, 568 A.2d 448 (1990); *State* v. *Faria*, 47 Conn. App. 159, 175, 703 A.2d 1149 (1997), cert. denied, 243 Conn. 965, 707 A.2d 1266 (1998). "Evidence is prejudicial when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into

evidence." (Internal quotation marks omitted.) *State* v. *Feliciano*, 256 Conn. 429, 454, 778 A.2d 812 (2001); see also *United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).

We begin our analysis by noting first that harassment in the second degree under § 53a-183 (a) (3) is a specific intent crime. In the present case, therefore, the state had the burden to prove, beyond a reasonable doubt, the defendant's intent to "harass, annoy or alarm" Edwards. General Statutes § 53a-183 (a) (3); see, e.g., *State* v. *Roy*, 233 Conn. 211, 212–13, 658 A.2d 566 (1995) (state must "convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense" [internal quotation marks omitted]).

The testimony of each of these four witnesses was relevant to the defendant's intent. Fuller's testimony corroborated the state's claim that the defendant was fixated on Edwards, and was relevant to show the defendant's specific intent to cause alarm with regard to the safety of Edwards' children. The testimony of Mugovero and Bergeson showed the defendant's specific intent to cause annoyance, and helped the jury understand how a police officer might have been alarmed by the defendant's conduct. Likewise, William Edwards' testimony was relevant to show the defendant's intent to "harass, annoy or alarm" Captain Edwards in violation of § 53a-183 (a) (3).[24]

---

[24] We note that the trial court admitted the testimony of these witnesses for the perhaps improper purpose of corroborating the state of mind of the victim. See footnote 25 of this opinion. Because the testimony was otherwise properly admissible to show the intent of the defendant, however, any evidentiary or instructional impropriety by the trial court was harmless. See, e.g., *State* v. *DeJesus*, 288 Conn. 418, 474–76, 953 A.2d 45 (2008) (uncharged misconduct evidence improperly admitted to prove common scheme or plan constituted harmless evidentiary impropriety where evidence otherwise was admissible to show defendant's propensity to engage in criminal behavior). The trial court properly instructed the jury that it should *not* consider the testimony as evidence of the defendant's character, thus preventing its consideration for a highly improper and prejudicial purpose.

Because the trial court gave limiting instructions to the jury regarding each witness' testimony so that the jury would know specifically for which purposes the testimony should be considered, the court minimized any undue prejudice that might otherwise have occurred.[25] "[T]he instructions limiting the use of the misconduct evidence [serve] to minimize any prejudicial effect that it otherwise may have . . . ." *State* v. *Feliciano*, supra, 256 Conn. 454; see also *State* v. *Cooper*, 227 Conn. 417, 428, 630 A.2d 1043 (1993); *State* v. *Brown*, 199 Conn. 47, 58, 505 A.2d 1225 (1986).

Furthermore, the record in the present case reflects that the trial court properly undertook a balancing of the probative value of the evidence against its prejudicial effect and determined that the prejudice did not outweigh its probative value. The trial court carefully listened to the defendant's arguments about prejudice as well as the state's offers of proof as to the probative value of the testimony. The court nevertheless properly found the evidence admissible.

We briefly address the defendant's claim that the testimony of Fuller and Bergeson was irrelevant because it concerned events that occurred three to four months after the defendant had been arrested. We conclude that the trial court reasonably could have determined that their testimony was relevant to the issue of

[25] The trial court gave the jury the following charge: "The testimony of this witness isn't being offered to go to the character of [the defendant], it is not to say that he has a bad character. That's not what it's admissible for. What we are talking about here is circumstantial evidence which I told you about and I'll tell you about again later. It goes to corroboration of the state of mind of the victim and not to [the defendant's] character which is not the issue here at all, [the defendant's] character. And when we do the final instructions I'll go back over this. I want you to be aware each time a witness testifies, that it's not [the defendant's] character that's in question here but what the state is doing now is putting on witnesses that they feel corroborate Captain Edwards' statements. And I'll be bringing that up again. I want you to hear that each time a witness testifies."

the defendant's intent because it concerned ongoing conduct by the defendant that was relevant to his earlier intent. In a similar case, *State* v. *Wells*, 100 Conn. App. 337, 344, 917 A.2d 1008, cert. denied, 282 Conn. 919, 925 A.2d 1102 (2007), the Appellate Court concluded: "[T]he defendant's state of mind at the time of the shooting may be proven by his conduct before, during and after the shooting. Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state." (Internal quotation marks omitted.) Likewise, in the present case, the trial court reasonably could have concluded that the defendant's mental state shortly after he left the voicemail messages for Edwards was relevant to his mental state at the time that he left the messages.

Under the given circumstances, with due regard for the broad leeway possessed by trial courts in determining the admissibility of evidence, we conclude that the trial court did not abuse its broad discretion in admitting the testimony of Fuller, Mugovero, Bergeson and William Edwards. Accordingly, we conclude that the trial court acted properly.

The judgment is affirmed.

In this opinion ROGERS, C. J., and NORCOTT and SCHALLER, Js., concurred.

PALMER, J., concurring in part and in the judgment. I agree with and join part II of the majority opinion. I disagree, however, with the majority's analysis in part I of its opinion. Specifically, I disagree with its interpretation of the dangerous client exception to the social worker-client privilege enumerated in General Statutes

§ 52-146q (c) (2),[1] and with its conclusion that that

[1] General Statutes § 52-146q provides in relevant part: "(b) All communications and records shall be confidential and, except as provided in subsection (c) of this section, a social worker shall not disclose any such communications and records unless the person or his authorized representative consents to such disclosure. Any consent given shall specify the individual or agency to which the communications and records are to be disclosed, the scope of the communications and records to be disclosed, the purpose of the disclosure and the expiration date of the consent. A copy of the consent form shall accompany any communications and records disclosed. The person or his authorized representative may withdraw any consent given under the provisions of this section at any time by written notice to the individual with whom or the office in which the original consent was filed. The withdrawal of consent shall not affect communications and records disclosed prior to notice of the withdrawal, except that such communications and records may not be redisclosed after the date of the notice of withdrawal.

"(c) Consent of the person shall not be required for the disclosure or transmission of such person's communications and records in the following situations as specifically limited:

"(1) Communications and records may be disclosed to other individuals engaged in the diagnosis or treatment of the person or may be transmitted to a mental health facility to which the person is admitted for diagnosis or treatment if the social worker in possession of the communications and records determines that the disclosure or transmission is needed to accomplish the objectives of diagnosis or treatment, or when a social worker, in the course of evaluation or treatment of the person, finds it necessary to disclose the communications and records for the purpose of referring the person to a mental health facility. The person shall be informed that the communications and records have been so disclosed or transmitted. For purposes of this subdivision, individuals in professional training are to be considered as engaged in the diagnosis or treatment of the person.

"(2) Communications and records may be disclosed when a social worker determines that there is a substantial risk of imminent physical injury by the person to himself or others, or when disclosure is otherwise mandated by any provision of the general statutes.

"(3) Communications and records made in the course of an evaluation ordered by a court may be disclosed at judicial proceedings in which the person is a party provided the court finds that the person has been informed before making the communications that any communications and records may be so disclosed and provided further that communications and records shall be admissible only on issues involving the person's mental condition.

"(4) Communications and records may be disclosed in a civil proceeding in which the person introduces his mental condition as an element of his claim or defense or, after the person's death, when his condition is introduced by a party claiming or defending through or as a beneficiary of the person. For any disclosure under this subdivision, the court shall find that

exception does not extend to testimony in a judicial proceeding. In my view, the majority's holding seriously and unnecessarily undermines the public safety purpose of the exception by limiting its applicability in such a way that fails to account for the very risk of danger that the exception was designed to address. I therefore would conclude that the trial court properly admitted Christopher Burke's testimony concerning the threats that the defendant, John Dean Orr, made against Kenneth Edwards, Jr.[2]

As the majority accurately states, in interpreting § 52-146q (c) (2), "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratex-

it is more important to the interests of justice that the communications and records be disclosed than that the relationship between the person and the social worker be protected.

"(5) If a social worker makes a claim for collection of fees for services rendered, the name and address of the person and the amount of the fees may be disclosed to individuals or agencies involved in such collection, provided written notification that such disclosure will be made is sent to the person not less than thirty days prior to such disclosure. In cases where a dispute arises over the fees or claims or where additional information is needed to substantiate the fees or claims, the disclosure of further information shall be limited to the following: (A) That the person did in fact receive the services of the social worker, (B) the dates and duration of such services, and (C) a general description of the types of services."

[2] Because the majority ultimately determines that the admissibility of Burke's testimony, although improper under § 52-146q (c) (2), was nevertheless harmless, it affirms the judgment of conviction. I therefore concur in the judgment.

tual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . *State* v. *Jenkins*, 288 Conn. 610, 620, 954 A.2d 806 (2008) . . . ." (Citations omitted; internal quotation marks omitted.) Part I of the majority opinion. Applying these principles to the present case leads me to conclude, contrary to the determination of the majority, that the trial court properly permitted the state to introduce Burke's testimony into evidence.

My first point of disagreement with the majority is its refusal to acknowledge that § 52-146q creates an evidentiary privilege for communications between a social worker and a client. The majority insists that § 52-146q merely provides for the confidentiality of such communications. The majority reasons that, under § 1-2z, it must refrain from construing the statute to establish a privilege because of the absence of textual support for that construction. See footnote 10 of the majority opinion. In my view, the defendant's claim, which implicates the scope of § 52-146q and its dangerous client exception, requires us to decide that question. Furthermore, § 52-146q is not clear and unambiguous on the point, and resort to extratextual evidence convincingly establishes that § 52-146q does, indeed, create such a privilege.[3]

To appreciate fully the scope of § 52-146q, it is necessary first to recognize the distinction between confidential communications and privileged communications.

[3] Indeed, as I explain more fully hereinafter; see footnote 5 of this opinion; in light of the majority's conclusion that Burke's testimony was barred by § 52-146q, it is apparent that the majority necessarily treats that statutory section as establishing a privilege.

See *State* v. *Kemah*, 289 Conn. 411, 417 n.7, 957 A.2d 852 (2008). "Unlike privileged information, confidential information generally may be disclosed under court order, over the objection of the information supplier, when a court deems it necessary to do so under a standard such as 'in the interests of justice' or 'necessity.' " C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 5.2, p. 220; see also 81 Am. Jur. 2d, Witnesses § 274 (2004) (" '[c]onfidentiality' and 'privilege' are not synonymous, and are two compatible, yet distinct, concepts; 'privilege' addresses a person's right not to have another testify as to certain matters as part of a judicial process, while 'confidentiality' addresses the obligation to refrain from disclosing information to third parties other than as part of the legal process"). Consequently, not all confidential communications are privileged.

It is true, of course, that § 52-146q (b) provides that "[a]ll communications and records shall be confidential . . . ." Another provision of the statute, however, expressly refers to the confidentiality rights created thereunder as privileges. See General Statutes § 52-146q (a) (5) (" '[a]uthorized representative' means . . . (C) if a person has been declared incompetent *to assert or waive his privileges under this section,* a guardian or conservator who is duly appointed to act for the person" [emphasis added]). Moreover, other closely related statutes that protect confidential communications between mental health professionals and their patients or clients give rise to a privilege. See, e.g., General Statutes § 52-146c (privileged communications between psychologist and patient); General Statutes § 52-146d (privileged communications between psychiatrist and patient); General Statutes § 52-146p (privileged communications between marital and family therapist and client); General Statutes § 52-146s (privileged communications between professional counselor and client). At the very least, therefore, § 52-146q is ambiguous as to whether it

provides only for the confidentiality of communications between a social worker and a client or, instead, establishes a social worker-client privilege.

Accordingly, we may consult extratextual sources to ascertain the statute's meaning in this respect. This evidence demonstrates convincingly that the statute was intended to create a privilege for social worker-client communications.[4] See C. Tait & E. Prescott, supra, § 5.49.1, p. 266 ("[t]he statute makes statements to social workers 'confidential,' when the statute clearly intends privilege status"). Indeed, there is no reason to believe that the legislature would have established a privilege for communications between all other mental health care providers and their patients or clients, and fail to create one for communications between social workers and their clients. Furthermore, the fact that § 52-146q establishes a privilege finds support in the pertinent legislative history. Specifically, Jan Fontanella, then president elect of the Connecticut chapter of the National Association of Social Workers, testified before the judiciary committee in support of the statute concerning the need to establish a social worker-client privilege. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1992 Sess., pp. 1352–54. We have recognized that testimony before a legislative committee may be relevant to a statutory analysis because such testimony tends to shed light on the problems that the legislature was attempting to resolve in enacting the pertinent legislation. E.g., *Burke* v. *Fleet National Bank*, 252 Conn. 1, 17, 742 A.2d 293 (1999). It therefore is clear that § 52-146q establishes a social worker-client privilege rather than a rule preserving the confidentiality of social worker-client communications, as the majority asserts.[5]

---

[4] The state claims that this is the proper interpretation of the statute.

[5] Despite its care in characterizing § 52-146q as a "confidentiality" statute; see footnote 10 of the majority opinion; the majority *treats* § 52-146q as establishing a privilege. This is so because if § 52-146q did not create a privilege, a disclosure of communications authorized under the statute's

The existence of a statutory privilege having been established, I next must consider the scope of that privilege in light of the statute's delineated exceptions to its prohibition on disclosure. General Statutes § 52-146q (b) provides in relevant part: "All communications and records shall be confidential and, except as provided in subsection (c) of this section, a social worker shall not disclose any such communications and records unless the person or his authorized representative consents to such disclosure. . . ." General Statutes § 52-146q (c) (2) provides: "Communications and records may be disclosed when a social worker determines that there is a substantial risk of imminent physical injury by the person to himself or others, or when disclosure is otherwise mandated by any provision of the general statutes." I disagree with the majority that these statutory provisions plainly and unambiguously provide that communications and records indicating that a client poses a substantial risk of imminent physical injury to himself or others may not be disclosed in court proceedings. Rather, § 52-146q (c) (2) plainly provides that such communications and records may be disclosed to third parties without the client's consent and, therefore, are not confidential. Cf. *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 330–31, 838 A.2d 135 (2004) (when statements to attorney are made in presence of third party who has no obligation to keep statements confidential, there is no reasonable expectation of confidentiality).[6] The provision does not specify

dangerous client exception necessarily would constitute a waiver of its confidentiality provisions, and, as a consequence, Burke would not be barred from testifying about those communications under well established waiver principles. In light of the majority's conclusion that Burke cannot so testify, however, the majority necessarily is treating § 52-146q as creating more than a rule of confidentiality with respect to those communications. As I explain more fully hereinafter, however, I disagree that the privilege bars Burke's testimony.

[6] The majority contends that "[c]onfidentiality is not destroyed by disclosure to prevent injury . . . ." The majority cites no authority, however, for the proposition that information that has been disclosed to a third person

one way or the other whether disclosable, nonconfidential communications and records are nevertheless privileged. In other words, the statute does not indicate to whom an appropriate disclosure under § 52-146q (c) (2) may be made, and it provides no indication with respect to the ramifications that such a disclosure will have on the communication. Section 52-146q (c) (2) also contains no language suggesting that the social worker's right to disclose threatening communications terminates upon the first disclosure of that threat; indeed, the statute provides no guidance whatsoever as to when, if ever, that right to disclosure is terminated. Because § 52-146q is silent on these issues,[7] and because the statute expressly provides for disclosure of communications to third parties—communications for which there could have been no reasonable expectation of confidentiality in the first place—§ 52-146q is not plain and unambiguous as applied to the present factual scenario, that is, with respect to the admissibility of Burke's testimony.[8] Accordingly, under § 1-2z, we may consider

who has no obligation to keep the information confidential nevertheless can be considered "confidential" in any sense of the word. If "confidential" does not mean "not subject to disclosure to third persons," what does it mean?

[7] The majority criticizes this assertion, claiming that " '[t]he fact that . . . relevant statutory provisions are silent . . . does not mean that they are ambiguous.' *Carmel Hollow Associates Ltd. Partnership* v. *Bethlehem*, 269 Conn. 120, 133, 848 A.2d 451 (2004) . . . ." (Citation omitted.) To the extent that this statement purports to indicate that statutory silence *cannot* render a statute ambiguous, the statement simply is incorrect as a matter of law and logic. "[Statutory] silence does not . . . *necessarily* equate to ambiguity"; (emphasis added) *Manifold* v. *Ragaglia*, 272 Conn. 410, 419, 862 A.2d 292 (2004); but silence may well give rise to ambiguity depending on the context in which it arises.

[8] I disagree with the majority that merely because § 52-146q (c) (2) contains no reference to court proceedings, it plainly and unambiguously does not apply to court proceedings. The dangerous client exception is entirely different from the exceptions under § 52-146q (c) (3) and (4), which, by their very nature, *necessarily* are limited *only* to court proceedings. Because § 52-146q (c) (2) is not necessarily so limited, the fact that it contains no indication one way or the other as to whether it extends to court proceedings does not lead to the conclusion that it cannot apply to such proceedings.

the legislative history and circumstances surrounding the enactment of § 52-146q (c) (2), the legislative policy underlying the provision, and its relationship to other statutory provisions and common-law principles governing the same general subject matter. See, e.g., *State v. Jenkins*, supra, 288 Conn. 620.

"The common-law principles underlying the recognition of testimonial privileges can be stated simply. For more than three centuries it has now been recognized as a fundamental maxim that the public . . . has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule. . . . Exceptions from the general rule disfavoring testimonial privileges may be justified, however, by a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." (Citations omitted; internal quotation marks omitted.) *Jaffee v. Redmond*, 518 U.S. 1, 9, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996). This court has held that, because the exercise of an evidentiary privilege "tends to prevent a full disclosure of the truth in court"; (internal quotation marks omitted) *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, supra, 267 Conn. 330; evidentiary privileges should be strictly construed. Id.; see also *Herbert v. Lando*, 441 U.S. 153, 175, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979) ("[e]videntiary privileges in litigation are not favored"); *United States v. Nixon*, 418 U.S. 683, 710, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974) (evidentiary privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth"); see generally *Viera v. Cohen*, 283 Conn. 412, 426–27, 927 A.2d 843 (2007) (statute in derogation of common law "should receive a strict construc-

tion and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of [statutory] construction," and "the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope" [internal quotation marks omitted]). Finally, consistent with the rule requiring strict construction of evidentiary privileges and with the underlying purpose of evidentiary privileges, communications must be confidential to have privileged status.[9] See *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.,* supra, 330–31 ("[s]tatements made in the presence of a third party . . . are usually not privileged because there is then no reasonable expectation of confidentiality" [internal quotation marks omitted]); id., 331 (noting "fundamental requirement that the communication be confidential in order to qualify for the [attorney-client] privilege"); 81 Am. Jur. 2d, supra, § 274 ("[a] person may not claim an evidentiary privilege as to communications that do not originate in the confidence that they will not be disclosed").

As I have indicated, General Statutes § 52-146q (c) (2) plainly and unambiguously provides that communications that give rise to a belief that a client poses "a substantial risk of imminent physical injury . . . to himself or others" may be disclosed and, therefore, are not confidential.[10] Accordingly, under the general rule

---

[9] Professor Charles McCormick states that the traditional conditions for the establishment of a privilege are:

"(1) The communications must originate in a confidence that they will not be disclosed;

"(2) This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties;

"(3) The relation must be one which in the opinion of the community ought to be sedulously fostered; and

"(4) The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation." 1 C. McCormick, Evidence (6th Ed. 2006) § 72, p. 340 n.7.

[10] "[T]he common-law rule [is] that everyone is presumed to know the law . . . ." *State* v. *Knybel,* 281 Conn. 707, 713, 916 A.2d 816 (2007). Accord-

that communications must be confidential to qualify for privileged status, and consistent with the rule that evidentiary privileges must be strictly construed, I would conclude that such communications are not privileged. Because they are not privileged, the state was entitled to use them in its case against the defendant.

My conclusion is bolstered by the legislative history and genealogy of General Statutes § 52-146e, which governs the psychiatrist-patient evidentiary privilege, and General Statutes § 52-146f, which sets forth specific situations in which consent for disclosure of psychiatric records and communications is not required. Two members of the committee that drafted the original versions of these statutes authored an article[11] in which they stated that the committee members "deliberately chose not to write a 'future crime' exception into the [proposed] bill" that eventually was enacted as No. 529 of the 1961 Public Acts.[12] A. Goldstein & J. Katz, "Psychiatrist-Patient Privilege: The GAP Proposal and the Con-

---

ingly, clients of social workers are presumed to know that, under § 52-146q (c) (2), a social worker is authorized to disclose certain threats against third parties and, therefore, that those threats are not made in confidence. Indeed, the defendant does not claim otherwise.

The defendant nevertheless maintains that "[a] client is . . . not on notice that threats—which come in varying kinds and degrees—will necessarily be disclosed." I agree that the application of § 52-146q (c) (2) to a particular communication requires the exercise of judgment, and, in determining whether a social worker's in-court testimony should be admitted, the trial court may be required to make a threshold determination as to whether the client's statements were disclosable to the target of the threat in the first instance. The question in this case, however, is not whether the statute applied to the defendant's statements to Burke but whether statements to which § 52-146q (c) (2) undisputedly applies are subject to an evidentiary privilege. Because clients are on notice that, if they communicate to a social worker threats that fall within the scope of § 52-146q (c) (2), those threats potentially may be disclosed and therefore are not confidential.

[11] See A. Goldstein & J. Katz, "Psychiatrist-Patient Privilege: The GAP Proposal and the Connecticut Statute," 36 Conn. B.J. 175, 183 and n.17 (1962).

[12] Number 529 of the 1961 Public Acts was codified at General Statutes (Cum. Sup. 1961) § 52-146a and is now codified as amended at General Statutes §§ 52-146e and 52-146f.

necticut Statute," 36 Conn. B.J. 175, 188 (1962). The committee members "were persuaded that, as a class, patients willing to express to psychiatrists their intention to commit crime are not ordinarily likely to carry out that intention. Instead, they are making a plea for help. The very making of these pleas affords the psychiatrist his unique opportunity to work with patients in an attempt to resolve their problems. Such resolutions would be impeded if patients were unable to speak freely for fear of possible disclosure at a later date in a legal proceeding." Id.

In 1969, however, the legislature amended General Statutes (Rev. to 1968) § 52-146a and created a new exception to the psychiatrist-patient privilege "when the psychiatrist determines that there is substantial risk of imminent physical injury by the patient to himself or others . . . ." Public Acts 1969, No. 819, § 4 (P.A. 819), now codified at General Statutes § 52-146f (2). The legislative history of P.A. 819 sheds no light on the reason for this legislative change of heart. The article by Goldstein and Katz makes it clear, however, that the exceptions originally listed in General Statutes (Cum. Sup. 1961) § 52-146a, now codified as amended at § 52-146f (1), (4) and (5), were intended to be exceptions to the evidentiary privilege, not merely exceptions to the nondisclosure requirement. See A. Goldstein & J. Katz, supra, 36 Conn. B.J. 186 ("[a]fter a great deal of discussion, and considerable compromise, our committee agreed upon three general situations in which the *privilege* was to be treated as terminated" [emphasis added]); see also Public Acts 1961, No. 529 (providing that, in three enumerated circumstances, now codified as amended at § 52-146f [1], [4] and [5], "[t]here shall be no privilege for any relevant communications under th[e] act").[13] This historical backdrop strongly suggests

___

[13] The "privilege" language was deleted from § 52-146a and replaced with the reference to confidentiality when the legislature amended the statute in 1969. See P.A. 819. The legislative history of P.A. 819 indicates that the

that the subsequently enacted exceptions to § 52-146e set forth in § 52-146f, including the dangerous patient exception, also were intended to create exceptions to the evidentiary privilege.

The relevant language of § 52-146q (c) was enacted in 1992; see Public Acts 1992, No. 92-225, § 2; and is substantially identical to the language of § 52-146f. Accordingly, it reasonably may be presumed that §§ 52-146e and 52-146f served as the pattern for § 52-146q. Moreover, I can conceive of no reason why a psychiatrist would be permitted to testify in a judicial proceeding regarding communications from a patient that gave rise to a reasonable belief that there was a substantial risk that the patient would cause serious injury to himself or others but a social worker would not. Accordingly, I believe that the exception set forth in § 52-146q (c) (2) was intended to have the same scope and meaning as the exception set forth in § 52-146f (2).[14]

The conclusion that § 52-146q (c) (2) creates an exception to the evidentiary privilege also is bolstered by the portion of the statute that permits disclosure

purpose of the amendment was to broaden the scope of the limitations on the disclosure of communications and records arising from the psychiatrist-patient relationship that were then in place. See 13 S. Proc., Pt. 7, 1969 Sess., pp. 3144–45, remarks of Senator John F. Pickett; 13 H.R. Proc., Pt. 9, 1969 Sess., p. 4191, remarks of Representative Robert G. Oliver. Nothing in the legislative history suggests, however, that the legislature intended to narrow the exceptions to the statute to prohibit disclosure of the communications and records in judicial proceedings.

[14] I emphasize that I do not conclude that *no* communication or record that comes within any of the exceptions set forth in § 52-146q (c) is privileged. Under § 52-146q (c) (1), for example, it is undoubtedly the case that the persons to whom the social worker discloses the records and communications are themselves subject to confidentiality requirements, and, therefore, the disclosure of the records and communications to them by the social worker would not destroy their confidentiality. I conclude only that, to the extent that any of the exceptions allow disclosures that would destroy the confidentiality of communications and records, those communications and records would not be privileged.

of communications and records when "disclosure is otherwise mandated by any provision of the general statutes." General Statutes § 52-146q (c) (2). General Statutes § 17a-101 (b) provides that social workers are mandated reporters under General Statutes § 17a-101a, which requires "[a]ny mandated reporter . . . who in the ordinary course of such person's employment or profession has reasonable cause to suspect or believe that any child under the age of eighteen years" has been subject to abuse or neglect or is at risk of serious harm, to submit a report to the commissioner of children and families or a law enforcement agency. Under General Statutes § 17a-101e (a), employers are prohibited from discriminating against a person who makes such a report or who "testifies or is about to testify in *any proceeding* involving child abuse or neglect." (Emphasis added.) It is clear to me, therefore, that the legislature contemplated that social workers, as mandated reporters, may be called on to testify regarding communications from a client in judicial proceedings involving the client's past abuse or neglect of a child, even though the legislature did not expressly permit such testimony in § 52-146q (c) (2). I find it highly unlikely that the legislature would have a different expectation with respect to communications giving rise to a belief that a client poses a substantial risk of serious harm to himself or others and yet place that exception within the same subdivision, indeed, the same sentence, of § 52-146q (c) (2).

My conclusion that communications falling within § 52-146q (c) (2) are neither confidential nor privileged also is supported by the majority of jurisdictions that have concluded that the duty to warn third parties about threatening statements made to a psychotherapist gives rise to an exception to the psychotherapist-client evidentiary privilege.[15] See *San Diego Trolley, Inc.* v. *Supe-*

---

[15] The majority contends that these cases are inapposite because they involve common-law exceptions to the psychotherapist-patient evidentiary

*rior Court,* 87 Cal. App. 4th 1083, 1091, 105 Cal. Rptr. 2d 476 (2001) ("[when] a patient is dangerous and disclosure of confidential communication is necessary to prevent harm, the psychotherapist-patient privilege has no application");[16] *Bright* v. *State,* 740 A.2d 927, 931–32 (Del. 1999) (recognizing exception to psychotherapist-patient privilege for threatening statements); *Guerrier* v. *State,* 811 So. 2d 852, 855–56 (Fla. App.) ("the goal of victim protection extends to eliciting from the psychiatrist relevant evidence . . . that will facilitate the prosecution of a crime committed against the victim by the dangerous patient"), review denied, 831 So. 2d 672 (Fla. 2002); *State* v. *Agacki,* 226 Wis. 2d 349, 363, 595 N.W.2d 31 (1999) ("[i]t would be absurd . . . to impose a testimonial privilege to prevent courts from considering the very communication leading to the responsible and lawful conduct of the psychotherapist"); but see *State* v. *Miller,* 300 Or. 203, 216, 709 P.2d 225 (1985) (public interest underlying dangerous patient exception "would rarely justify the full disclosure of the patient's confidences to the police, and never justify a full disclosure in open court, long after any possible

---

privilege. As I have indicated, however, it is perfectly appropriate to interpret § 52-146q (c) (2) in light of relevant public policy and "common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *State* v. *Jenkins,* supra, 288 Conn. 620.

[16] The California Evidence Code, § 1024, provides: "There is no privilege under this article if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger." Cal. Evid. Code § 1024 (Deering 2004). The court in *San Diego Trolley, Inc.,* explained that "[t]he exception is an expression of the [l]egislature's determination that the value of safeguarding confidential psychotherapeutic communications, as great as it is, is outweighed by the public interest in protecting foreseeable victims from physical harm." *San Diego Trolley, Inc.* v. *Superior Court,* supra, 87 Cal. App. 4th 1091. Although, unlike the California rule, § 52-146q (c) (2) does not expressly state that communications that fall within its scope are not privileged, it must be construed in light of this public interest.

danger has passed"), cert. denied, 475 U.S. 1141, 106 S. Ct. 1793, 90 L. Ed. 2d 339 (1986).[17]

Two federal Circuit Courts of Appeals also have recognized the dangerous patient exception to the psychotherapist-patient privilege. See *United States* v. *Auster*, 517 F.3d 312, 320 (5th Cir.), cert. denied, 555 U.S. 840, 129 S. Ct. 75, 172 L. Ed. 2d 67 (2008); *United States* v. *Glass*, 133 F.3d 1356, 1359–60 (10th Cir. 1998) (recognizing dangerous patient exception to psychotherapist-patient privilege in cases in which threat is serious and disclosure is only means of averting harm). The court in *Auster* rejected the reasoning of two circuit courts that had concluded that there is no such exception because those courts failed to recognize that, under federal evidentiary law, the test for the applicability of an evidentiary privilege is "whether there was a reasonable expectation of confidentiality when the statement was made."[18] (Internal quotation marks omitted.) *United States* v. *Auster*, supra, 317 (rejecting reasoning of *United States* v. *Chase*, 340 F.3d 978 [9th Cir. 2003], cert. denied, 540 U.S. 1220, 124 S. Ct. 1531, 158 L. Ed. 2d 157 [2004],[19] and *United States* v. *Hayes*, 227 F.3d

---

[17] In support of its conclusion, the Oregon Supreme Court relied in large part on the reasoning of the Connecticut Bar Journal article discussing the enactment of Public Acts 1961, No. 529, and indicating that the drafting committee deliberately had chosen not to include a dangerous patient exception in the proposed legislation. See *State* v. *Miller*, supra, 300 Or. 216 n.9, quoting A. Goldstein & J. Katz, supra, 36 Conn. B.J. 188. As I have indicated, however, subsequent amendments to the statute demonstrate that our legislature ultimately changed its position.

[18] As I have indicated, this is also the traditional rule under the common law. See footnote 9 of this opinion.

[19] The court in *Chase* stated summarily that "a communication can be 'not confidential' under state law . . . but still 'privileged' under the Federal Rules of Evidence." *United States* v. *Chase*, supra, 340 F.3d 988. Rule 501 of the Federal Rules of Evidence provides in relevant part: "Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States

578 [6th Cir. 2000]).[20] The court in *Auster* concluded that, when a patient is aware that his threats will be shared with the target of the threats, who has no obligation or incentive to keep the threats confidential, "[t]he marginal increase . . . in effective therapy achieved by privileging psychotherapist-patient communications at trial . . . is de minimis." *United States* v. *Auster*, supra, 319. Put differently, if, in accordance with a dangerous patient exception to the privilege, a therapist lawfully discloses a patient's communications to the police or to the person or persons placed at risk by the patient, the damage to the psychotherapist-patient relationship has been done, and in-court testimony by the therapist is likely to cause little, if any, additional harm to that relationship.[21] This is particularly true, as

in the light of reason and experience. . . ." As I have indicated, at common law, a communication must be confidential to qualify for an evidentiary privilege. See footnote 9 of this opinion. Indeed, as the court in *Auster* recognized, the United States Supreme Court has stated that the psychotherapist-patient "privilege covers *confidential* communications made to licensed psychiatrists and psychologists [and] *confidential* communications made to licensed social workers in the course of psychotherapy"; (emphasis in original; internal quotation marks omitted) *United States* v. *Auster*, supra, 517 F.3d 315, quoting *Jaffee* v. *Redmond*, supra, 518 U.S. 15; and has stated in dictum that "there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist." (Internal quotation marks omitted.) *United States* v. *Auster*, supra, 315 n.5, quoting *Jaffee* v. *Redmond*, supra, 18 n.19. In any event, even if the federal courts have the authority to adopt an evidentiary privilege that is not dependent on the confidentiality of the covered communication, any such rule would not be binding on this state.

[20] The court in *Hayes* stated that "it cannot be the case that the scope of a federal testimonial privilege should vary depending [on] state determinations of what constitutes 'reasonable' professional conduct." *United States* v. *Hayes*, supra, 227 F.3d 584. As the court in *Auster* noted, however, the application of "[f]ederal law does not depend on state law but instead [turns] on the lack of confidentiality . . . ." *United States* v. *Auster*, supra, 517 F.3d 317. Nevertheless, the reasoning of the court in *Hayes* has no relevance to our interpretation of this state's law.

[21] As the court in *Auster* explained, "[c]onsider the marginal impact on effective therapy of allowing a statement into evidence that the patient knew would be communicated to third parties when he uttered it. In such a

the court in *Auster* underscored, in view of the fact that neither the target of the threat nor the police have any obligation to keep the information confidential, and it is highly unlikely that they will do so. See, e.g., id., 318 ("there are likely mutual acquaintances between the target and the patient—e.g., friends, [coworkers], family—and the target will almost certainly tell them, if for no other reason than to let them know that there is a potentially serious problem with the patient and that everyone ought to be on the lookout for trouble").

The court further concluded in *Auster* that the "cost benefit scales" strongly favor an exception to the privilege in a criminal trial; id., 319; where the public's interest in the full disclosure of the truth is especially great. Indeed, there may be cases in which the psychotherapist or social worker is the *only* source of information concerning the threats made by the patient or client. There also may be cases, of course, in which the testimony of the psychotherapist or social worker is critical to the state's criminal case against the patient or client. When that person remains a threat, and when a criminal prosecution is the best way to protect against that danger, the core purpose of the statutory exception is defeated by barring the psychotherapist or social worker from testifying at trial. In sum, I find the court's reasoning in *Auster* persuasive and in accord with the common-law principles governing evidentiary privileges.

The majority's contrary conclusion is incorrect because its reasoning is flawed in a number of important

case, the atmosphere of confidence and trust has already been severely undermined. Now, the patient's target and deepest enemy . . . knows the patient's secret. And for sincere threats, the target can now defend himself. If the therapist's professional duty to thwart the patient's plans has not already chilled the patient's willingness to speak candidly, it is doubtful that the possibility that the therapist might also testify in . . . court will do so." (Citation omitted; internal quotation marks omitted.) *United States* v. *Auster*, supra, 517 F.3d 318.

respects. First, the majority states that, "[i]f the legislature wanted to make specific allowances for the disclosure of otherwise confidential communications between social workers and their clients in court proceedings, it could have done so . . . ." In support of this observation, the majority relies on subdivisions (3) and (4) of § 52-146q (c), which expressly permit disclosures of communications and records by social workers in court proceedings in certain situations. This reliance is misplaced for several reasons. First, those provisions pertain to court proceedings *only*, that is, the exception to the general rule of nondisclosure that is carved out under each of those subdivisions is expressly restricted to such proceedings. By contrast, the dangerous client exception of § 52-146q (c) (2) is an exception of general applicability that applies whenever its requirements are met. Because the dangerous client exception and the exceptions limited to court proceedings are materially different in this respect, they bear no logical connection to one another. Consequently, no inference reasonably can be drawn that the legislature expressly would have mentioned court proceedings in § 52-146q (c) (2) if it had intended that that provision would apply to such proceedings.

The majority's faulty reasoning in this respect may be demonstrated by applying it to the fee collection exception of § 52-146q (c) (5). See footnote 1 of this opinion. Under that exception, a social worker who makes a claim for collection of fees for services may provide certain otherwise privileged information to "individuals or agencies involved in such collection . . . ." General Statutes § 52-146q (c) (5). The provision, however, contains no express reference to court proceedings. Under the majority's reasoning, namely, that an exception to the privilege does not apply to judicial proceedings unless the language of the exception contains an express reference to such proceedings, the

person or agency involved in the collection of the unpaid fee on behalf of the social worker would be unable to bring an action to recover those fees, if necessary, because § 52-146q (c) (5) contains no express reference to judicial proceedings. Having recognized the need for a limited exception to the privilege for fee collection purposes, the legislature cannot possibly have intended such an absurd result.

Finally, the purpose of § 52-146q (c) (3) and (4) is to *limit the scope of the disclosure* allowed by the exceptions, not to expand the forums in which disclosure may be made. Nothing in subdivisions (3) and (4) indicates that the legislature intended that some exceptions to the general rule requiring consent for disclosure were for *confidentiality* purposes and some exceptions were for *privilege* purposes.

The majority also relies on General Statutes § 52-146o (a), which provides in relevant part that "in any civil action or any proceeding preliminary thereto or in any probate, legislative or administrative proceeding, a physician or surgeon . . . shall not disclose" communications or information made by a patient, in support of its contention that the legislature would have expressly allowed court testimony in § 52-146q (c) (2) if that is what it had intended to do. The majority further relies on General Statutes § 52-146c (b), which provides in relevant part: "[I]n civil and criminal actions, in juvenile, probate, commitment and arbitration proceedings, in proceedings preliminary to such actions or proceedings, and in legislative and administrative proceedings, all communications shall be privileged and a psychologist shall not disclose any such communications . . . ." Contrary to the majority's contention, however, these statutes tend to demonstrate that, if the legislature had intended to *prohibit* disclosures in court proceedings under the exception set forth in § 52-146q (c) (2), it knew how to do so expressly.

The majority also relies on the principle that statutory exceptions to statutorily created evidentiary privileges, like all statutory exceptions, "are to be strictly construed with doubts resolved in favor of the general rule rather than the exception . . . . [When] express exceptions are made, the legal presumption is that the legislature did not intend to save other cases from the operation of the statute." (Internal quotation marks omitted.) *Falco* v. *Institute of Living*, 254 Conn. 321, 330, 757 A.2d 571 (2000). The issue before us in this case, however, is not the scope of the communications and records to which § 52-146q (c) (2) applies, which, I acknowledge, would be subject to strict construction under *Falco*. Rather, the issue is whether the communications and records that undisputedly come within the scope of § 52-146q (c) (2) may be disclosed in judicial proceedings or, instead, are privileged. In my view, that question is governed by the principles that evidentiary privileges must be strictly construed and that only confidential information qualifies for privileged status. See, e.g., *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, supra, 267 Conn. 330 (because evidentiary privileges tend to prevent full disclosure of truth in court, they must be strictly construed).

Finally, the majority's interpretation has potentially dangerous consequences that are antithetical to the purpose of § 52-146q (c) (2). One such example, which I previously described, is the case in which the social worker's testimony is critical to the state's criminal prosecution of the client—a course of action that will be most prudent when the client remains a danger to the target of his threat. The following additional example also is illustrative of the serious adverse consequences of the majority's holding. A social worker, S, learns from her client, C, that C intends to cause immediate and serious physical injury to a third person, T. Because the communication falls within § 52-146q (c)

(2), S relays the information to T. Like S, T takes the information seriously and goes to court to obtain a restraining order barring C from having any contact with T. Under the majority's interpretation of § 52-146q (c) (2), however, S cannot testify at the court hearing on T's application for a restraining order. Because S's testimony is the only evidence that T has to establish that C poses an immediate and serious danger to T, and because T's testimony regarding S's disclosure to T would consist of inadmissible hearsay, the court has no basis on which to issue the restraining order. In such circumstances, the obvious objective of § 52-146q (c) (2), that is, to make it possible for T to protect herself from C, is thwarted.[22] I do not believe that the legislature

---

[22] The majority dismisses this hypothetical application of the interpretation of § 52-146q (c) (2) that it adopts on the ground that "statutory interpretation involves the determination of the meaning of the statutory language as applied *to the facts of the case* . . . ." (Emphasis in original; internal quotation marks omitted.) Footnote 22 of the majority opinion. Surely, the majority does not mean to imply that its interpretation of § 52-146q (c) (2) would not be binding in a case involving these hypothetical facts. Contrary to the majority's suggestion that this court is *prohibited* from considering the future ramifications of its interpretation of a statute, this court is *required* to consider those ramifications. Indeed, the only reason that the majority gives for declining to consider the hypothetical is that such consideration is barred by § 1-2z, a broad assertion with which I also disagree. To the extent that the majority deems the hypothetical to be irrelevant because of its conclusion that § 52-146q is plain and unambiguous as applied to the facts of this case, I previously have explained my disagreement with the majority's determination in that regard.

I also am confused by the majority's substantive response to the posited hypothetical. The majority raises the possibility that the potential harm posed by its interpretation of § 52-146q may be mitigated by testimony from the social worker (1) concerning the existence of a professional relationship with the client, and (2) that the social worker did in fact warn the third party, in accordance with the dangerous client exception, of the substantial and imminent risk of being harmed physically by the client. Footnote 22 of the majority opinion. Contrary to the majority's suggestion, it seems quite evident that such testimony would effectively constitute disclosure of information that inarguably is protected under the statute. Moreover, if, in fact, the majority is correct in suggesting that § 52-146q does not preclude testimony by a social worker that he warned a third party in accordance with the statute's dangerous client exception, I am unable to discern why the

reasonably could have intended such an unfortunate and potentially harmful result. In fact, the ramifications of the majority's decision are far broader than they may appear. There is nothing in the language of the exceptions to the statutory provisions governing other similar privileges, including the psychiatrist-patient privilege; see General Statutes § 52-146d et seq.; the psychologist-patient privilege; see General Statutes § 52-146c; the marital and family therapist-client privilege; see General Statutes § 52-146p; and the professional counselor-client privilege; General Statutes § 52-146s; or the public policy underlying those exceptions, that would result in an interpretation of those provisions that is different from the interpretation that the majority has adopted for purposes of the dangerous client exception to the social worker-client privilege.

For all the foregoing reasons, I would conclude that, because the communications and records that are subject to § 52-146q (c) (2) are not confidential, they are not privileged, and, therefore, the trial court properly admitted Burke's testimony about the defendant's threatening statements.

---

facts of the present case do not place it outside the purview of § 52-146q altogether. The trial court expressly advised Burke *not* to testify about the content of the defendant's communications to him but, instead, about his perception and reaction to those communications. Burke, therefore, did not testify about the specifics of what the defendant had told him but merely that he had met with the defendant and that he had warned Edwards of potential harm to him and his family based on the defendant's angry feelings toward Edwards. To the extent that these disclosures are not materially different from those that the majority indicates may be excluded from the scope of § 52-146q, I cannot see why, if the majority's suggested interpretation is correct, Burke's testimony would be problematic. In such circumstances, I do not understand why the majority would not first resolve this threshold issue of statutory interpretation, one way or the other, before addressing the secondary question of whether the challenged testimony properly was admitted under the dangerous client exception set forth in § 52-146q (c) (2).