******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TERI A. BUHL
(AC 35606)

Beach, Bear and Pellegrino, Js.*

*Argued April 15—officially released August 12, 2014*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, geographical area number twenty,
Wenzel, J.)

*Stephan E. Seeger*, assigned counsel, for the appel-
lant (defendant).

*Jonathan M. Sousa*, special deputy assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Donna M. Krusinski*, assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Teri A. Buhl, appeals from the judgment of conviction, rendered following a trial to the court, of harassment in the second degree in violation of General Statutes § 53a-183 (a) (2) and breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (4).[1] On appeal, the defendant claims that there was insufficient evidence to sustain her conviction of either crime. We affirm in part and reverse in part the judgment of the trial court.

The following facts, which reasonably could have been found by the court, and procedural history inform our review. In June, 2010, the defendant, a journalist, was involved in a romantic relationship with P, and she frequently visited his home, where P's daughter M also resided.[2] M kept some diary entries of her personal thoughts and feelings in a drawer in her nightstand. On June 23, 2010, seventeen year old M attended her high school graduation and had dinner at a friend's house. When she later went home to change her clothes before going out with friends, M received a telephone call from a friend who told her that he had seen a "fake Facebook profile"[3] of someone using the name "Tasha Moore" that had information about M on it. M went onto Facebook, viewed Moore's profile through her friend's Facebook page, and saw the following message on Moore's page: "[M] . . . gets so drunk at parties that boys know she is an easy hook up. In April at [A's] house party she gave [O] a blow job and then threw up. [O] calls her that deep throat JAP. [M] told her friends that . . . she thought giving the best BJ would help make [O] her boyfriend. You wonder why some . . . [high school] girls never learn how to behave around boys." M was quite upset "because the person that they had identified was not even—was not the right person and that was all false information," and she was concerned that others would see the posting.

Moore's Facebook profile also contained photographs of some of M's handwritten diary entries, which contained personal information about M's attendance at a party where she performed fellatio on a boy she liked. M also noticed that Moore had "friended" several of M's friends and classmates, who, because of their status as "friends" of Moore, could view Moore's profile. See footnote 3 of this opinion. Distraught, M did not go out with her friends that night, but stayed at home, where she received additional telephone calls from friends who had seen Moore's profile. M sent a message via Facebook to Moore, asking her to take down the posts and warning her that, if she did not take them down, M would go to the police. When the posts remained, M went to the police on June 24, 2010. M also telephoned her parents and told them what had happened. Later, M returned to the police station with her father, P, who learned the details of what had hap-

pened directly from M.

Later in the day, on June 24, 2010, P received a sealed envelope, sent by overnight mail, containing copies of M's handwritten diary pages and an unsigned letter that provided: "[P], I am a casual friend of your daughter [M]. I told my mom about the story you'll read in this letter that [M] shared with us this spring and she said I should share it with you. [O] the guy [M] hooked up with, has been bragging to my boyfriend and other senior guys about what [M] did with him that night. He's not really a nice guy. She just gets so drunk so fast sometimes I don't know if she even remembers hooking up with guys. I know she wants [O] to be her boyfriend but he hardly talked to her after that night. She only showed a few of us these letters when she got back from vacation. Please don't tell her one of her friends wrote you but my Mom said it is best if you read them." M and P returned to the police department with these materials.

On June 25, 2012, P had dinner with the defendant and told her what had happened. On June 27, 2010, the defendant told P that it was she who had sent him the letter after meeting with an anonymous girl who had the materials in her possession. The defendant stated that she convinced the girl to allow her to turn the materials over to P along with a cover letter explaining the circumstances. The defendant would not disclose the girl's name to P because she stated that she had promised to keep the source confidential. The defendant told P that she would contact the investigating police department. P returned to the police station a few days later and met with Officer Daniel Gulino. Gulino wanted the names of everyone who had access to P's home because there was no sign of forced entry and someone had obtained pages of M's diary, which was kept in her nightstand. P also turned over the materials sent by the defendant and told Gulino that the defendant would be contacting him.

After the defendant attempted to contact Gulino by e-mail and by telephone, Gulino made contact with the defendant by telephone. The defendant told Gulino that she was doing an investigative report on underage drinking. Gulino asked the defendant if she was "Tasha Moore," and the defendant responded: "I'm Teri Buhl, not Tasha Moore." Gulino later turned his investigation over to Sergeant Carol Ogrinc. Ogrinc then served on Facebook an ex parte order for the disclosure of the internet protocol (IP) address associated with the profile of Tasha Moore. Ogrinc also served on Cablevision an ex parte order for the name of the person associated with the IP address she had been investigating, and Cablevision reported that this IP address was connected to the defendant.[4]

On October 21, 2010, the defendant was arrested and charged with harassment in the second degree, breach

of the peace in the second degree, and interfering with an officer. After a trial to the court, she was convicted of the harassment and breach of the peace charges. Following the denial of her postverdict motions, the court sentenced the defendant on the harassment conviction to three months incarceration, execution suspended after fifteen days, followed by one year of probation, and on the breach of peace conviction to six months incarceration, execution suspended after fifteen days, followed by one year of probation, such sentences to run consecutively, for a total effective sentence of nine months incarceration, execution suspended after thirty days, followed by one year of probation, the maximum amount of probation allowed. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that "[t]he trial court erred in finding [her] guilty of harassment . . . where the evidence at trial was not sufficient for [a] finding of guilt beyond a reasonable doubt without the trier of fact shifting the burden of proof on the defendant and/or impermissibly impinging on her constitutional rights." The state argues that, on the basis of the evidence at trial, the court "reasonably concluded that the evidence established all of the elements of harassment in the second degree, including identification . . . [and that] the trial court's finding of guilt did not violate the first amendment because it was based on the defendant's physical action and not on the content of her communication, and because the 'journalist privilege' does not exist in this context." We conclude that the evidence was sufficient to sustain the defendant's conviction of harassment in the second degree.

The standard of review for a sufficiency of the evidence claim employs a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trial judge] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the [trial judge] if there is sufficient evidence to support the . . . verdict." (Internal quotation marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 517, 782 A.2d 658 (2001).

"While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense[s], each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 617, 682 A.2d 972 (1996). "[I]n determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . .

[A]n inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference." (Internal quotation marks omitted.) *State* v. *Niemeyer*, supra, 258 Conn. 519. "Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . [Finally] in responding to a claim of evidentiary insufficiency . . . we view all of the evidence, and the reasonable inferences drawable therefrom, in favor of the [trier's finding of guilty]." (Internal quotation marks omitted.) *State* v. *White*, 139 Conn. App. 430, 434, 55 A.3d 818 (2012), cert. denied, 307 Conn. 953, 58 A.3d 975 (2013).

General Statutes § 53a-183 (a) provides in relevant part: "A person is guilty of harassment in the second degree when . . . (2) with intent to harass, annoy or alarm another person, he communicates with a person by . . . mail, by electronically transmitting a facsimile . . . by computer network, as defined in section 53a-250, or by any other form of written communication, in a manner likely to cause annoyance or alarm . . . ."

The state charged the defendant with violating § 53a-183 (a) (2) via long form information as follows: "The State of Connecticut alleges that on or about June 23, 2010 . . . the defendant . . . did harass, annoy or alarm other persons, to wit: [M] and [P] by communicating to [P] by way of sending mail via overnight delivery to his home . . . the contents of which did cause annoyance or alarm. Furthermore, [the defendant] did harass, annoy, or alarm [M] by communication via electronically transmitting a facsimile through a connection with a telephone network/computer network and any other form of written communication, on or about June 23, 2010, at approximately 5:30 p.m., via Facebook, to wit: notes and journal pages . . . ."

The state charged the defendant with three separate acts of harassment combined in one count. Under our case law, "[w]here a charging document alleges, in the conjunctive, that an offense has been committed in more than one way, a guilty finding may stand if the evidence supports a conviction based upon any one of the statutory alternatives." *State* v. *Wohler*, 231 Conn. 411, 415, 650 A.2d 168 (1994).[5] Accordingly, in order to establish that the defendant was guilty of a violation of § 53a-183 (a) (2) as charged, the state was required to prove that the defendant: (1) on or about June 23, 2010, intended to harass, annoy or alarm M by sending mail via overnight delivery to the home of P, and this manner of communication was likely to cause annoyance or alarm to M; or (2) on or about June 23, 2010, intended to harass, annoy or alarm P by sending mail

via overnight delivery to his home, and this manner of communication was likely to cause annoyance or alarm to P; or (3) on or about June 23, 2010, at approximately 5:30 p.m., intended to harass, annoy or alarm M by communicating, via Facebook, notes and diary pages, and that this manner of communication was likely to cause annoyance or alarm to M.[6]

On appeal, the defendant's arguments are somewhat diffuse, with very little legal analysis as to the effect of many of the alleged errors made by the court. In her statement of issues as to the harassment conviction, she asserts that the court had insufficient evidence to find her guilty of harassment in the second degree without improperly shifting the burden of proof onto her and improperly impinging on her constitutional rights. In her appellate brief, as to the state's allegations of harassment in the second degree by her communicating via Facebook, she argues that (1) the state failed to provide an expert on the intricacies of Facebook postings and privacy settings despite the court's clear statements that it was not familiar with Facebook, (2) there was no evidence that the Facebook postings were calculated to reach M, (3) M's testimony about how Facebook worked should not have been admitted or considered reliable by the court, (4) there was no link established between the defendant and the Moore Facebook profile, (5) the court drew an improper inference from the defendant's failure to produce evidence of who else could have created the Moore Facebook profile, evinced by the court's question to defense counsel during closing argument: "[W]hat evidence is there that anyone else had access to . . . those [diary] pages such that they would have been in a position to post them," (6) the court improperly shifted the burden to the defendant to prove who created the Moore Facebook profile, (7) this alleged improper burden shifting violated the due process clause of the fourteenth amendment, and (8) this burden shifting violated her first amendment rights as a journalist not to give up her source.

Regarding the allegations of her committing harassment in the second degree by mailing the anonymous letter, the defendant argues that (1) she sent the letter after P already knew about the Facebook postings so the content of the letter could not have surprised or shocked him, (2) there was no evidence that the letter was sent with an intent to harass P because he already was familiar with the content of the letter, (3) there was no evidence that the defendant had any motive to harass or annoy P, (4) the letter was not addressed to M, (5) there was no evidence that M ever saw the letter, (6) there was no evidence that the letter was sent to P with the intent to harass M, and (7) the state improperly argued that the content of the letter would alarm any father, therefore impinging on the defendant's right to free speech under the first amendment by focusing on

the content of the letter rather than on the mailing of the letter.

First, we conclude that the defendant has not adequately briefed a constitutional claim regarding free speech or a journalistic privilege. Because the defendant has failed to provide any legal analysis in support of such claims, we decline to review them. See *State* v. *Orr*, 291 Conn. 642, 645 n.4, 969 A.2d 750 (2009), quoting *State* v. *T.R.D.*, 286 Conn. 191, 213–14 n.18, 942 A.2d 1000 (2008) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted . . . but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." [Internal quotation marks omitted.]).

We next conclude that the defendant has set forth an insufficiency of the evidence claim regarding her conviction of harassment in the second degree. Accordingly, we will consider whether the court had before it sufficient evidence to convict the defendant of a violation of § 53a-183 (a) (2) under any of the three ways the defendant was alleged to have committed this crime.

Harassment in the second degree under § 53a-183 (a) (2), like § 53a-183 (a) (3), is a specific intent crime that requires the state to prove, beyond a reasonable doubt, the defendant's intent to harass, annoy or alarm another person. See *State* v. *Moulton*, 310 Conn. 337, 355–56, 78 A.3d 55 (2013) (§ 53a-183 [a] [2] and [3] employ identical language and are identical in scope except subdivision [2] involves use of mail while subdivision [3] involves use of telephone); *State* v. *Orr*, supra, 291 Conn. 668 (§ 53a-183 [a] [3] is specific intent crime).

"The legislature decreed in § 53a-183 (a) (2) that a person is guilty of harassment in the second degree when with the requisite intent to harass 'another person, he communicates with a person' in a prohibited manner. . . . These words 'are to be understood according to the commonly approved usage of the language' . . . and 'must be given their plain and ordinary meaning and be interpreted in their natural and usual sense unless the context indicates that a different meaning was intended.' . . . The language of § 53a-183 (a) (2) plainly states that for a defendant to violate that statute, he must first have the intent to harass, annoy or alarm 'another' person, i.e., the intended victim, and, second, he must communicate with 'a' person, possibly a third party, in a manner likely to achieve his ends. Thus, a defendant is prohibited from intending to harass 'another' person and then acting on his intent by communicating with 'a' person. The statute by its terms does not require direct communication with the person

who is the target of the harassment . . . ." (Citations omitted; emphasis omitted.) *State* v. *Snyder*, 40 Conn. App. 544, 551–52, 672 A.2d 535, cert. denied, 237 Conn. 921, 676 A.2d 1375 (1996), on appeal after remand, 49 Conn. App. 617, 717 A.2d 240 (1998).

In the present case, the defendant was alleged, inter alia, to have harassed M and P by sending an overnight letter to P that contained copies of very private and personal diary pages that M had stored in the back of her nightstand drawer in her bedroom. The identity of the defendant as the person who mailed the materials is not in question. The defendant admitted to sending these materials via overnight mail. On the issue of the defendant's intent in mailing these materials, our law instructs that because "we cannot know with certainty the defendant's intent, we must infer it from the reaction of the victim[s] and the circumstances of [the mailing]." *State* v. *Marsala*, 43 Conn. App. 527, 537, 684 A.2d 1199 (1996), cert. denied, 239 Conn. 957, 688 A.2d 329 (1997).

The defendant admitted to sending this mailing anonymously. She had alternative methods of delivering the materials to P other than the disguised delivery she selected. For example, she could have handed or mailed the materials to P with an explanation of how she had obtained them and why she wanted him to have them, but she waited several days before telling P that it was she who had mailed the materials to him instead of letting him know contemporaneously with the delivery. The defendant's hiding of her identity as the sender of the materials for a number of days is circumstantial evidence of her intent to harass, annoy and alarm M and P. The evidence also demonstrates that the defendant's act of sending the anonymous letter disguising her identity by having it purport to be sent from one of M's classmates with copies of private, personal diary pages that had been kept by M in a nightstand in her bedroom, caused both M and P to wonder how and be alarmed that someone could have obtained these materials from M's bedroom without their knowledge or permission.

M testified that although the defendant's relationship with P seemed good, she thought that the defendant wanted to make her life miserable, that the defendant tried to make her uncomfortable, and that the relationship between her and the defendant was tense. She also testified that she had written the diary notes that are pertinent here while she was on vacation, and that she had stuffed them in the back of her nightstand drawer after returning from vacation. She stated that the diary pages that were in evidence had been mailed to her home in an overnight envelope, and that they were copies of the originals, which she still had in her possession. She further testified that she was alarmed that someone had been in her house and gone through her nightstand drawer.

P testified that he thought his relationship with the defendant was good, and that she had access to his home, even residing with him in 2010. He further testified that on June 24, 2010, he received an overnight envelope containing copies of his daughter's personal diary pages, together with an anonymous letter, and that he was shocked and surprised by the materials. He stated that he was "outraged that [copies of the diary pages] were in someone else's hands because they were very personal notes," and that he felt violated knowing that some anonymous person had these materials. P stated that he discussed this matter with the defendant at dinner on the Friday evening following his receipt of the materials, that he explained how upset he was about them, and that the defendant had no reaction. It was not until the following Sunday that the defendant told P that she had sent the materials, which, she claimed, she had received from a source, but that she could not reveal the name of that source. Clearly both P and M were alarmed by this mailing.

On the basis of these surrounding circumstances and the reaction of the victims in this case, we conclude that the evidence was sufficient for the court to have found, beyond a reasonable doubt, that the defendant intended to harass, annoy or alarm M and P by sending these materials anonymously, via overnight delivery, and that this caused annoyance and alarm to both victims.

II

The defendant also claims that there was insufficient evidence to sustain her conviction of breach of the peace in the second degree. She argues that there was insufficient proof that the posted material was public, and that the state needed to present an expert witness on the issue of Facebook privacy settings and policies.[7] We conclude that the evidence was insufficient to establish that the Facebook postings were public.

As stated in part I of this opinion, the standard of review for a sufficiency of the evidence claim employs a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trial judge] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Niemeyer*, supra, 258 Conn. 517.

Section 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person . . . . For purposes of this sec-

tion, 'public place' means any area that is used or held out for use by the public whether owned or operated by public or private interests." In this case, the state specifically charged the defendant as follows: "The State of Connecticut alleges that on or about June 23, 2010 . . . the defendant . . . did with intent to cause inconvenience, annoyance or alarm, publicly exhibit, distribute, post up or advertise offensive, indecent or abusive matter concerning [M] via Facebook, in violation of . . . § 53a-181 (a) (4)."

The defendant argues that there was insufficient evidence that the Facebook postings on Moore's page were publicly exhibited and that this insufficiency was compounded by the lack of expert testimony of the workings and privacy settings of Facebook. We agree.

During cross-examination, M testified regarding Facebook as follows:

"Q. So, I guess the point is, you were never friends with Tasha Moore?

"A. Yes, but her page was unprivate.

"Q. Okay, you never became friends with Tasha Moore?

"A. You could see it. No, but I have gone on through [my friend's] Facebook and had seen it through his page.

"Q. Thank you. You went on through your friend's Facebook page to see it?

"A. Yes. Then could see everything through mine.

"Q. I understand it. But, you weren't invited in and you didn't see it from anyone else's page but [your friend's]?

"A. Right, everybody else had been invited except me.

"Q. Okay, everybody else, all eight other people or all seven or eight people?

"A. Multiple people had been invited, [but] not everybody accepted.

"Q. All right. So, it's a private invitation. You have to be invited in?

"A. Sure."

M also testified, however, that she was able to view Moore's Facebook page through her own page because Moore's page was "unprivate" and "seemed to be public." The state argues that this testimony is sufficient to establish that Moore's Facebook page was public. It also argued before the trial court that even if Moore's Facebook profile was private, at least eight other people saw or knew of Moore's Facebook page and that, therefore, the postings and the subject matter were public for purposes of § 53a-181 (a) (4). We disagree.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent

of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *State* v. *Moulton*, supra, 310 Conn. 357.

Section 53a-181 (a) (4) requires that the defendant "*publicly exhibits*, distributes, posts up or advertises any offensive, indecent or abusive matter . . . ." (Emphasis added.) The statute then defines the term "public place" to mean "any area that is used or held out for use by the public whether owned or operated by public or private interests." General Statutes § 53a-181 (a). Therefore, we conclude that under the plain language of the statute, the state was required to prove that the matter concerning M was exhibited, distributed, posted or advertised in a *public place*, or, more precisely, in an area used or held out for use by the public.[8] If the evidence demonstrated that approximately eight people were invited to view the page (and some did not accept the invitation), and that Moore's Facebook page was not available for noninvited viewing, we would conclude that the page was not held out for use by the public, and, therefore, Moore's Facebook page was not publicly exhibited, posted or advertised. The question now becomes whether there was sufficient evidence for the court reasonably to have concluded that, under the evidence presented, Moore's Facebook page was held out for use by the public.

At the start of M's testimony, the court specifically stated: "I should forewarn counsel, I don't keep a Facebook page, so please feel free to explain the significance of different Facebook issues as we get to them because I will not necessarily appreciate them." A review of M's testimony reveals that she commented on several aspects of Facebook, including postings, tagging, public pages, unprivate pages, private pages, invitations, notifications, accepting requests, and privacy settings. When defense counsel attempted to question her on whether other Facebook users had to be invited to view the pages of "minors" because of Facebook privacy rules, the court stated that it would allow counsel to ask M questions related to "her understanding tied to the time she's viewing Facebook pages," but that it would "not [allow] questions as to the Facebook policy."

The defendant argues that this demonstrates the need for a Facebook expert to testify about its policy regarding privacy settings and the meaning of all of the rele-

vant specific Facebook terminology. She also argues that M's testimony was inconsistent as to whether Moore's privacy settings were public, private, or something in between, and that this, combined with the court's lack of familiarity with Facebook, clearly demonstrates that the state needed to present an expert to meet its burden of proof that she publicly displayed the relevant postings. She contends that the transcript "reflect[s] an unfamiliar court attempting to determine the nature and function[s] of Facebook privacy settings, limited to [M's] 'impressions' alone," and that M "was neither qualified nor consistent on the subject matter of private/public settings in a Facebook universe." We agree that the state did not present sufficient evidence to prove beyond a reasonable doubt that Moore's Facebook page was public.

"Although expert testimony is permitted in a great many instances, it is required only if the question involved goes beyond the field of ordinary knowledge and experience of judges and jurors." C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 7.5.4, pp. 410–11. "The trier of fact need not close its eyes to matters of common knowledge solely because the evidence includes no expert testimony on those matters." (Internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 149, 869 A.2d 192 (2005).

In this case, the trial court was very frank with counsel in stating that it had no familiarity with Facebook, and it asked several questions of counsel and M during M's testimony. The court also clearly told counsel that it would not allow M, the only witness to testify about Facebook settings, to testify about Facebook privacy policy. Our Supreme Court recently explained in *State* v. *Altajir*, 303 Conn. 304, 310 n.2, 33 A.3d 193 (2012), that Facebook's "general infrastructure, including [its] privacy settings, is highly dynamic and in many cases may be accurately assessed only with reference to a limited time period." "Due to the dynamic nature of Facebook and other such social network sites, these details, as well as basic structural features of the social network, are subject to frequent modification. Care should therefore be taken to assess information relating to social network sites on a case-by-case basis, with due attention to the nature of the site at the time relevant to the case." Id., 307 n.1. This cautionary language underscores the need for testimony or other evidence from a person with suitable knowledge, experience or other relevant qualification relating to the operation of Facebook's privacy settings applicable to the issues in this case.[9]

In the present case, therefore, we are persuaded that the state needed additional testimony from a person qualified to provide evidence to establish that the Facebook page created in the name of Tasha Moore was a public page on June 23, 2010, or on other dates when

it was accessed by M or her friends. The state presented only one witness, M, to testify regarding the public or private nature of Moore's Facebook profile, without demonstrating that she was qualified to provide any testimony beyond how she accessed the Facebook page, and that testimony was contradictory. The state did not establish that M had sufficient knowledge of Facebook privacy settings and policies to enable her to provide testimony about them. The court, therefore, specifically prohibited M from testifying as to Facebook policy. Additionally, the court at the beginning of M's testimony notified the parties that it lacked familiarity with Facebook and would need assistance with respect to Facebook issues. Accordingly, we conclude that the state failed to meet its burden of proving beyond a reasonable doubt that Moore's Facebook page was "publicly exhibit[ed], distribut[ed], post[ed] up or advertis[ed]"; see General Statutes § 53a-181 (a) (4); and, therefore, we further conclude that the evidence was insufficient to support the defendant's conviction of breach of the peace in the second degree.

The judgment is reversed only as to the conviction of breach of the peace in the second degree and the case is remanded with direction to render judgment of acquittal on that charge; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The court found the defendant not guilty of interfering with an officer in violation of General Statutes § 53a-167a.

[2] We refer to the victims by their first initials to protect their privacy interests.

[3] "Facebook is a social network website." *State* v. *Damone*, 148 Conn. App. 137, 151 n.3, 83 A.3d 1227, cert. denied, 311 Conn. 936, 88 A.3d 550 (2014). " 'Each [Facebook] user maintains a "profile," which is a webpage containing basic information such as the individual's year of graduation and home town, as well as personal information, such as his or her name and whether he or she is single or in a relationship (i.e., "relationship status"). Users may inform others about what they are doing by changing the "current status" message that appears at the top of the profile. . . .

" 'Facebook allows users to designate "friends." An individual who is invited to be a member's Facebook friend may either accept or reject the offer, thus providing individual control over one's list of friends. The user can control how much information to post and who can view this information by editing their privacy settings. Specific groups of people (a network or friends) may be granted limited access to specific parts of the profile.

" 'Facebook members can upload digital pictures into virtual photo albums. A user can be "tagged" in these pictures so that his or her name appears in the caption as a link to his or her profile. If the individual does not want to be associated with the picture, he or she can "untag" it, thereby removing the name and the link (though this does not remove the picture). Members are able to post comments on photos, which appear as messages below the picture.' T. Pempek et al., 'College Students' Social Networking Experiences on Facebook,' 30 J. Applied Developmental Psychol. 227, 230 (2009)." *State* v. *Altajir*, 303 Conn. 304, 306–307 n.1, 33 A.3d 193 (2012).

"[C]ustomizable privacy settings allow individual Facebook users to exercise considerable control over the availability of information associated with their profiles. Moreover, the social network's general infrastructure, including these privacy settings, is highly dynamic and in many cases may be accurately assessed only with reference to a limited time period." Id., 310 n.2.

"Due to the dynamic nature of Facebook and other such social network

sites, these details, as well as basic structural features of the social network, are subject to frequent modification. Care should therefore be taken to assess information relating to social network sites on a case-by-case basis, with due attention to the nature of the site at the time relevant to the case. Up-to-date information regarding Facebook may be found in the 'help' section of the Facebook website, http://www.facebook.com/help/?page= 260315770650470. Further explanations of Facebook related terminology may be found in the website's glossary, http://www.facebook.com/help/glossary." Id., 306 n.1.

[4] When the state attempted to link directly the IP address used to establish the Facebook profile of Tasha Moore with the IP address assigned to the defendant by Cablevision, defense counsel objected on hearsay grounds, and the state withdrew its line of questioning. The court specifically found that there was no direct link established between the defendant's Cablevision account and Tasha Moore's Facebook profile. No one from Facebook was called to testify.

[5] We note that the defendant made no claim before the trial court and that he makes no claim on appeal that the information improperly was duplicitous. See *State* v. *Browne*, 84 Conn App. 351, 380–83, 854 A.2d 13 (discussing duplicity and recognizing that "[a] single count is not duplicitous merely because it contains several allegations that could have been stated as separate offenses" [internal quotation marks omitted]), cert. denied, 271 Conn. 931, 859 A.2d 930 (2004).

[6] The third allegation of harassment does not specify to whom the Facebook communication was directed in an effort to annoy or alarm M. The statute specifically requires that the defendant, "with intent to harass, annoy or alarm another person," in this case M, "communicates with *a person* . . . ." (Emphasis added.) General Statutes § 53a-183 (a) (2); see also *State* v. *Snyder*, 40 Conn. App. 544, 552, 672 A.2d 535 ("§ 53a-183 [a] [2] plainly states that for a defendant to violate that statute, he must first have the intent to harass, annoy or alarm 'another' person, i.e., the intended victim, and, second, he must communicate with 'a' person, possibly a third party, in a manner likely to achieve his ends"), cert. denied, 237 Conn. 921, 676 A.2d 1375 (1996), on appeal after remand, 49 Conn. App. 617, 717 A.2d 240 (1998). There is no allegation in the information regarding to whom the defendant is alleged to have communicated.

[7] The defendant also claims that there was insufficient evidence to sustain her conviction of breach of the peace in the second degree because there was no proof that she acted as Tasha Moore on Facebook, there was no proof that the postings affected anyone other than M and P, and there was no proof that the statements were likely to produce violence or acts of public disorder. She also argues that the court impermissibly shifted the burden onto her to prove that she was not the person who had posted materials about M on a Facebook profile created in the name of Tasha Moore, and that this impinged on her constitutional rights as a journalist to keep her sources confidential. Because we conclude that the state failed to meet its burden of proving that the postings were public, we need not discuss these other arguments.

[8] On appeal, the state does not argue against such a definition. In its appellate brief, citing to *State* v. *Battista*, 10 Conn. App. 499, 501–502, 523 A.2d 944 (1987), the state argues that the Appellate Court has "considered the forum of the behavior at issue and whether the defendant could reasonably expect the public to be present during the behavior, rather than the number of people actually present." In *Battista*, we determined that a man who stood on the street in front of the home of his former in-laws and repeatedly shouted disparaging things about his former wife, acted in a public place. See *State* v. *Battista*, supra, 502. We were not concerned with the number of people present, but with the area being available to the public. See id.; see also *State* v. *Bradley*, 124 Conn. App. 197, 203, 4 A.3d 347, cert. denied, 295 Conn. 917, 990 A.2d 867 (2010) (president's office at university "public place" because he had open door policy to all students and encouraged visits).

[9] Such testimony need not necessarily be in the form of expert testimony.